[Civ. No. 3359.   Third Appellate District.—January 19, 1928.]

FRANCES C. WOOD et al., Respondents, v. GEORGE J. HENLEY et al., Appellants.

Drapeau, Orr & Gardner for Appellants.

John F. Poole for Respondents.

HART, J.—This action was brought by the plaintiffs to quiet their alleged title to an undivided one-half interest in a certain tract of land, consisting of 160 acres, situated in what is known as "Sespe Canyon," in the mountainous regions of Ventura County.

The complaint, which was filed on the twenty-eighth day of May, 1921, specifically describes the 160 acres, and alleges that the defendants claim and assert an interest in said property adverse to plaintiffs; that the claim so made by the defendants is "without any right whatever, and that said defendants have no estate, right, title or interest in or to said real property above described, or any part thereof; that plaintiffs Frances C. Wood and Ira B. Wood, are now and were at all times herein mentioned husband and wife. That defendants George J. Henley and Melita Henley have an undivided one-fourth interest in said real property and hold the same jointly and as tenants in common with plaintiffs herein. That plaintiffs hereby tender all legal State and County taxes, penalties and tax costs that defendants may have paid on said undivided one-half interest in said real property belonging to plaintiffs."

The defendants answered, specifically denying the averments of the complaint, and also filed a cross-complaint, in which they allege that the defendants, at the time of the filing of the complaint herein, and for a long time prior thereto, were "and they still are the owners, in possession, and entitled to the possession of that certain undivided one-half interest in the lands described in the complaint"; that plaintiffs wrongfully and without any right whatever claim an estate or interest therein adverse to the defendants. The prayer of the cross-complaint, as is that of the complaint with respect to the defendants, is the usual one in actions to quiet title to real property.

The plaintiffs, answering the cross-complaint, admit that they claim the ownership in fee of the undivided one-half interest in controversy, and specifically deny the other averments of said pleading.

Judgment passed for the plaintiff Frances C. Wood in accord with the prayer of the complaint.

The appeal, supported by a bill of exceptions, is by the defendants from said judgment.

The defendants claim title to the undivided one-half interest in dispute by adverse possession under the terms of both sections 323 and 325 of the Code of Civil Procedure. They further claim that the action by plaintiff is barred by the statute of limitations. (Code Civ. Proc., sec. 318.)

Section 323 of said code provides:

"For the purpose of constituting an adverse possession by any person claiming a title founded upon a written instrument, or a judgment or decree, land is deemed to have been possessed and occupied in the following cases:

"1. Where it has been usually cultivated or improved;

"2. Where it has been protected by a substantial inclosure;

"3. Where, although not inclosed, it has been used for the supply of fuel, or of fencing-timber for the purposes of husbandry, or for pasturage, or for the ordinary use of the occupant;

"4. Where a known farm or single lot has been partly improved, the portion of such farm or lot that may have been left not cleared, or not inclosed according to the usual course and custom of the adjoining country, shall be deemed to have been occupied for the same length of time as the part improved and cultivated."

Section 325 reads:

"For the purpose of constituting an adverse possession by a person claiming title, not founded upon a written instrument, judgment, or decree, land is deemed to have been possessed and occupied in the following cases only:

"1. Where it has been protected by a substantial inclosure.

"2. Where it has been usually cultivated or improved.

"Provided, however, that in no case shall adverse possession be considered established under the provision of any section or sections of this code, unless it shall be shown that the land has been occupied and claimed for the period of five years continuously, and the party or persons, their predecessors and grantors, have paid all the taxes, state, county, or municipal, which have been levied and assessed upon such land."

It appears that the undivided one-fourth interest in the 160 acres not accounted for in the complaint or the cross-

complaint was owned by one Mason Bradfield, so that, prior to the claim by defendants of ownership of the undivided one-half interest in dispute was asserted, the 160 acres were owned as follows: One-fourth by defendant Melita Henley, wife of defendant George J. Henley; one-fourth by said Mason Bradfield, and the remaining one-half (the interest in controversy) by the plaintiff Frances C. Wood.

The claim by defendants that they acquired title to the undivided one-half interest in controversy by adverse possession founded upon a written instrument grows out of the sale to the state of the said one-half interest in the year 1917 for delinquent taxes for certain years preceding that of the sale of said interest to the state.

As before stated, the land described in the complaint—the entire 160 acres—is situated in a canyon in the mountains of Ventura County. It is of rock formation and wholly useless for the purposes of farming or husbandry. It possesses value, however, as a stone quarry, where stone for building purposes is to be obtained.

The interest in dispute, for a long period of time prior to the purported sale thereof to the state for the nonpayment of taxes assessed thereon, was owned by the plaintiff Ira B. Wood. At some time after said Wood acquired title to said undivided interest, he conveyed the same to his wife, who is his coplaintiff. Ira B. Wood never at any time resided on the premises, but, after he acquired the interest in dispute, he visited and inspected the 160 acres on two different occasions. Mrs. Wood, down to the time of the trial of this action, had never been on or seen the property. No taxes assessed against said interest were paid by Mrs. Wood or by any other person for her for the year 1911, nor for the succeeding years of 1912 and 1913. George J. Henley testified that he knew of these delinquencies in the payment of the taxes on said interest, having obtained his information regarding the same by making inquiry of the assessor of Ventura County in each of the years named. On June 22, 1917, however, the said undivided one-half interest having been previously sold or attempted to be sold by the county tax collector to the state, the latter sold said undivided interest to the Ventura Abstract Company, a corporation, whose principal place of business was at the city

of San Buenaventura, in Ventura County. On July 6, 1917, said corporation quitclaimed said interest to the defendant George J. Henley. It was discovered at some time (the record does not show just when) that the sale of the said interest to the state was void because the notice of such proposed sale by the tax collector was not given as required by law. The sale to the state being, therefore, void, it follows, of course, that the purported sale of the interest to the Abstract Company and that of the latter to George J. Henley were also void and of no legal effect. It was at the trial, and it is here admitted by the defendants, that the sale to the state and the sale by the state, as explained were and are void.

Ira B. Wood testified that, acting for his wife, he addressed a letter in the year 1916 to the tax collector of Ventura County, inquiring about the matter of the tax delinquencies on the interest in question, and asking for a statement of the taxes unpaid on the property; that he received a reply from the tax collector, informing him of the sale of the interest to the state in the year 1912 and suggesting that he communicate with the proper state department at Sacramento for further information; that, subsequently, his wife addressed a letter (witness could not remember whether to the tax collector of the county or to some state officer connected with delinquent tax matters) asking whether it would be sufficient if she would pay the taxes for the year 1916, the year in which she wrote and mailed said letter, and all back taxes. No reply was made to that letter, but later, and the day before the sale was to be made by the state, the witness received a phone message at his home (the witness said he thought it was from the tax collector) asking him (witness) if he was going "to take care of those taxes." The message was received late in the day and the witness did not leave for San Buenaventura until the following morning, in ample time, though, to have reached that place before the hour at which the sale was noticed to take place. The train was for some reason delayed, with the result that the witness did not arrive at the county seat until some ten minutes after the sale had taken place. Wood, nevertheless, interviewed a Mr. Barnard through whom the Abstract Company purchased the undivided one-half interest in dis-

pute. He testified that Barnard stated to him that it was the intention of the Abstract Company to sell the property to defendant George J. Henley; that he (witness) then warned Barnard that he had been given legal advice to the effect that the sale was invalid, and that a transfer of the interest by said company to said Henley would be void.

On July 2, 1917, acting for and in behalf of his wife, Wood addressed a letter to said Barnard, reading, in part, as follows:

"Your night letter of first Inst. received. You doubtless have already received my telegram of 29th ultimo, and letter 30th ult.

"The people pestering you for an assignment of interest in the property of Frances C. Wood supposedly acquired by you at the delinquent tax sale held in Ventura, June 22nd, last, do not worry me.

"The fact is, you have no title to the property in question to convey, and whatever these people would pay you they would lose, for a contest of their claim would certainly ensue. For several reasons the sale referred to was invalid. . . . Any rights assumed from that sale would be promptly and successfully contested, and such contest would also establish the invalidity of all the other sales made on the same occasion. However, we are perfectly willing to deal equitably with you in remuneration for all money you may pay out in satisfaction of tax demands, for essential services in the matter, and in appreciation of the spirit of consideration shown when the writer saw you. We can get together and in a reasonable time as intimated in my previous letter. I think we both wish only what is about right."

As to his alleged possession and occupancy of the interest in controversy, the defendant testified:

"I first went up into the Sespe Canyon years ago. I went up there to go into the stone business. Between Christmas and New Year's in 1887 the first time. I went up in 1887, and came back in 1888. I had a claim up there in 1888. This claim was on this very land in question. It was up above the Devil's Gate. That was northwest of the land in question. With reference to making improvements and doing work upon this land I built a road. I broke through in 1900, that is, through the Devil's Gate, and through this

land. This road was built through the Devil's Gate in 1900. . . .

"I first put a road across the property in question in 1898. This road went entirely across this property. Since that time I have kept the road up. I was living on the property north of this along in 1904 and 1905. I built the house which I have indicated on the map as soon as we broke through the Devil's Gate and got a wagon road in that country. This was prior to 1900. I am referring to my dwelling house. The Devil's Gate is on this property in question. We went around underneath the Devil's Gate. By 'Devil's Gate' I mean a tunnel and narrow gorge. The property is very mountainous, all cliffs. This house in which I was living in 1904 and 1905 was destroyed by fire. I first made improvements on the property in controversy, other than building the road, at the end of March or April, 1916."

The occupation and use by said Henley of the premises prior to and down to the year 1916 was, according to his own testimony intermittent. He testified that, during that period, he was engaged, principally, in blasting rock and taking out and selling stone to those desiring it for any purpose or use. "I am living on the property now," said Henley testified. "I first went on that property to live," he continued, "in 1916, right after the fire (referring to the destruction by fire of a house on the premises in which he had lived). As I remember it, the fire occurred in the month of August. I paid taxes on this half interest at Ventura. By that, I mean I paid them at the Tax Collector's office. I bought (referring to the purchase at the tax sale) in 1917, and paid the taxes in 1918, 1919, 1920 and 1921. At the time I entered upon this property my claim of ownership thereof was based on my possession of said property. . . . I actually began work in February (of 1916), worked in March and worked in April of that year, and there hadn't been anyone that had done anything on it but me for years." Henley testified that he had been informed by the county assessor that there had been no taxes paid on the property for the years 1911, 1912, and 1913; that in each of those years he would ask the assessor if the taxes had been paid for the particular year so inquired about; that the assessor was the party who informed

him that the property in dispute had been sold to the state for taxes. He further testified that he owned in his separate right forty acres of land "below" and adjoining the 160 acres. This tract of land was known as the "McIntyre land," although he purchased it from a "Mr. Keyes."

In the year 1918, some time after the month of August, he (Henley) erected on or on land adjoining the premises a stone house to be used by him for residential purposes. He testified that, when he was erecting the house, he supposed, and, in fact, believed, that he was building it on the "McIntyre land" which he had purchased from said Keyes, but that, after completing its construction, a man by the name of Owen made a survey of the premises with reference to the dividing line between the 40-acre tract and the 160-acre tract involved herein, and so discovered, or at least thought he discovered, that the house was within and on the 160-acre tract, about 12 feet from said line. He stated that he erected and maintained a fence around or about the house and a gate to afford passage to and from the house.

It appears that running through the land is a stream of water in which fish abound and that during the summer seasons of the year persons on "camping trips" for pleasure had frequently been permitted by the defendant, George J. Henley, to camp for a few days on the land and engage in the diversion of "catching fish," said Henley, so he testified, charging such persons a small fee for the privilege so granted. In fact, said Henley testified that he erected on the land several cheaply built cabins to rent to such persons as were taking a brief "outing" and desired to remain on the land for a few days during summer seasons for the purpose of fishing.

It further appears that "above" and adjoining the 160 acres and in the Sespe Canyon, a company, known as the "Sespe Light & Power Company," and another company, known as the "Sespe Oil Company," owned a body of land, the first company maintaining a light and power plant and the last named being engaged, as may be assumed, although as to that the testimony is indefinite, in the development of oil. There was also another company operating near the 160 acres, known as the "Sespe Land & Water Company."

Henley testified that he improved and kept in repair a road running into and partly over the 160 acres and connecting with a road maintained by the Sespe corporations. These roads led to the properties of said companies. There was no other possible way of passage to and from the properties of said corporations than by means of the roads mentioned. Henley himself so testified. In fact, he said, there was no way of entering upon the 160 acres or into the Sespe Canyon other than by the road he improved and kept in repair.

Over objection by counsel for the plaintiffs, said Henley was allowed to testify to the value of the stone house erected by him on the premises and the value of other improvements made by him thereon, by giving an estimate of the "reasonable cost" of their construction. Thus he placed the value of the house at $6,000. On the other improvements—a barn, the "camping cabins" referred to, a house which he stated that he occupied during the interval of time between the date of the destruction by fire of the house in which he had previously lived on the premises and the time at which the stone house was completed or ready for occupancy, and a pipe-line 1400 feet in length—he placed a value amounting in the aggregate to the sum of $1,200.

The defendant Melita Henley testified that with her separate money she purchased her one-quarter interest in the 160 acres from a Mrs. Troy; that her husband and co-defendant "had and was in possession" of the one-half interest in February and March, 1916, and "right on, of 1916." She further testified:

"He was working all the spare time he had and besides that he often had help. He was brushing out and blasting rock and cutting down brush and cleaning off the place in general. He started in February, 1916. That country up there is all rocks, of course he had to blast out a lot of the rocks. He was fixing it up for campers and to live on in general, and he blasted out those rocks and chopped the brush and cleaned it up, you know. The first habitation or dwelling house which was put on there, he put this cabin, this house we are living in now, that was put on there in April, 1916, that is the two rooms, we have added onto it since. He first commenced staying on the property sleeping there in the last of April, 1916. He did not stay

there continuously after that, just stayed there once in a while Saturday nights when campers would be coming in there, he did not sleep there continuously, no, he was working there whenever he had spare time.''

The foregoing is a sufficient *résumé* of the testimony for all the purposes of the decision of this appeal.

The major question submitted here for decision is whether the findings upon which the validity of the judgment depends are afforded support by the evidence. The defendant and cross-complainant makes certain other points, the nature of which will be explained when we reach the consideration thereof.

■ The dominant attribute of a tenancy in common is that the cotenants hold the common land by unity of possession, for which reason there can be no specific or determinate portion of the common land which any one of such tenants can claim as his in severalty. (See Civ. Code, secs. 685 and 686.) In other words, a tenant in common, by reason of the fact that he and his cotenants hold the common lands by unity of possession, cannot ''know his own severalty, and, therefore, they all occupy promiscuously. . . . The only unity (in such a tenancy) is that of possession; and for this Littleton gives the true reason, because no man can certainly tell which part is his own; otherwise even this would soon be destroyed.'' (1 Blackstone's Commentaries, pp. 589, 590.)

■ It follows, therefore, that a tenant in common of an undivided interest in the common property is entitled to the possession of the whole thereof as against all persons except his cotenants. ■ Each of such tenants has the right to enter upon and occupy the whole and every part of the common lands. This being so, such a tenant has no right to exclude his cotenant from any portion of the common lands.

■ The logical consequence of the foregoing propositions is that the possession of one cotenant is possession for all. (7 Cal. Jur., sec. 13, p. 346, and cases named in the footnotes.) ''So long as one of several tenants in common remains in possession, as he is presumed to hold for himself and for his cotenants, his acts of ownership are naturally construed as evidence of the possession of both. (*Packard* v. *Moss*, 68 Cal. 123 [8 Pac. 818].) ■ And each has a right to assume that the possession of his cotenant is his own posses-

sion until informed to the contrary, either by actual notice or by acts and declarations which may be equivalent to notice. (*Aguirre* v. *Alexander*, 58 Cal. 21; *Tabler* v. *Peverill*, 4 Cal. App. 671 [88 Pac. 994].) The presumption is that the possession of one cotenant is amicable until the contrary is shown." (7 Cal. Jur., sec. 13, p. 346; as to the proposition last stated, see *Tully* v. *Tully*, 71 Cal. 338 [12 Pac. 246]; *McNeil* v. *First Congregational Society*, 66 Cal. 105 [4 Pac. 1096]; *Olney* v. *Sawyer*, 54 Cal. 379; *Carpentier* v. *Mendenhall*, 28 Cal. 484 [87 Am. Dec. 135].) But it is undoubtedly true that "the relation of cotenants is not necessarily so intimate as to preclude one of them from asserting and acquiring an adverse claim against the others to the common property. ▪ As between them there may be a subsequent adverse possession. To acquire such a title, however, there must first be an ouster of the cotenant, or a repudiation of the relation." (1 Cal. Jur., sec. 34, p. 542, and cases therein referred to.) ▪ The mere fact of the exclusive possession of the common lands by the cotenant claiming the adverse title, or the mere payment by him of the taxes on the common property, or both acts taken together, for the period of five years, will not of themselves be sufficient to establish a several title in such cotenant to the common property under the doctrine of adverse possession, since such acts alone would only be consistent with the rule that the possession of one cotenant of such property is the possession of all the cotenants and that such payment of the taxes is an act presumptively for the benefit of all. In such a case, to constitute an adverse possession, there must be some positive act or acts upon the part of the cotenant claiming title to the whole or a specific portion of the property by adverse possession as against his cotenants, which acts are brought to the notice of the latter, either actually or constructively, clearly and unequivocally indicating an intention by such cotenant to oust his cotenants from the possession of the property. Or, as the proposition is stated in 1 California Jurisprudence, section 35, page 544:

"When a tenant in common is in possession, and exercises acts of ownership of an unequivocal character, overt and notorious, and of such a nature as, by their own import, to impart information and give notice to the other cotenants that

an adverse possession and a disseizin are intended to be asserted against them, then the possession of such tenant in common is adverse. And any act of the cotenant in the exclusive possession which manifests an intention on his part to hold exclusively for himself is equivalent· in law to an actual ouster. It is the intent which determines the character of the possession; but it is essential that this intent be in some mode, either by actual or presumptive notice, directly or indirectly communicated to the other cotenant. This intent is not the secret purpose of the occupant, but is the purpose which the acts themselves manifest, and the acts done must be manifested to the person against whom the ouster is directed." (See the cases cited in the footnotes of the text.)

In *Humbert* v. *Trinity Church,* 24 Wend. (N. Y.) 577, cited approvingly in *Colman* v. *Clements,* 23 Cal. 245, and other succeeding California cases, it is said that the possession of the tenant claiming to hold adversely to his cotenants must be with the intent so to hold, and that it must appear that such intent had been "indicated by acts calculated to exclude the complainants from all participation as tenants in common."

In *Northrop* v. *Wright,* 24 Wend. (N. Y.) 221, it was held that a possession by a tenant in common for twenty-seven years, during which period of time "he had not recognized the right of his cotenant, was not (in or of itself) sufficient to presume an ouster." (See *Colman* v. *Clements, supra,* p. 248.)

The following instances of acts constituting an ouster by one cotenant, as against another or others, are found in the books: The exclusion of one tenant, by his cotenant, from the possession of any part of the larger lot, before a survey and location of the common land has been made (*Carpentier* v. *Webster,* 27 Cal. 524); the refusal of a tenant in possession, on a proper demand, to let his cotenant into possession (*Phelan* v. *Smith,* 100 Cal. 158 [34 Pac. 667]; *Greer* v. *Tripp,* 56 Cal. 209; *Miller* v. *Myers,* 46 Cal. 535): "the making and taking and recording of deeds and mortgages by the cotenant affecting the whole of the property and the unquestioned retaining of all the rents and profits" for the statutory period, "and the placing of valuable improve-

ments upon the property, all under a claim of exclusive ownership.'' (*Smith* v. *Barrick,* 41 Cal. App. 28 [182 Pac. 56, 58].)

Thus we have presented some of the principles of law regarding tenancies in common and the relative rights of the cotenants for the reason that the defendant Melita Henley, admittedly a cotenant of the common property in controversy, jointly with her husband and co-defendant claims in the answer and cross-complaint to have established title to the undivided interest of Frances C. Wood by adverse possession under section 325 of the Code of Civil Procedure, or title by such possession not founded on a written instrument; and also because George J. Henley, from the very fact that he claims title to the undivided interest of Frances C. Wood, necessarily can claim nothing more than being a cotenant in the common property with Melita Henley and Mason Bradfield. ■ Therefore, when tested by the principles above announced, it is perfectly clear that the finding of the court that the defendants acquired no title by adverse possession to the undivided interest of Frances C. Wood is sufficiently supported. In the first place, it is to be noted that the defendants were never at any time in the exclusive possession of the common property or any part thereof. They made no claim at the trial, and make none here, that the defendant Melita Henley and Mason Bradfield, if not in actual occupancy of the common property, were not entitled to the possession or the right to occupy said property as cotenants thereof. There was no particular or specific portion of the lands of which Melita Henley or George J. Henley could claim the right to the possession to the exclusion of Frances C. Wood and Mason Bradfield. The possession of Melita Henley was Bradfield's and Mrs. Wood's possession. Melita Henley could not, without the assent of her cotenants, select and segregate from the common lands a particular or a determinate portion thereof and claim it as her interest therein. Nor could George J. Henley do likewise in attempting to establish title by adverse possession to the interest of Mrs. Wood. By this we are not to be understood as saying that a cotenant of a tenancy in common or a stranger to the title may not establish a title by adverse possession to the undivided interest

in such tenancy of another cotenant. What we hold is, as above in other language it has been stated, that such cotenant or stranger cannot put his finger on a particular portion of the common property itself, and, by occupying and improving and paying taxes thereon for the statutory period, say and claim that such particular portion is that portion of the common property that the undivided interest to which it is sought to establish title by adverse possession represents. But apart from all these considerations, the record brings to us no testimony showing that all the essential elements of adverse possession under section 325 exist. From George J. Henley's own testimony, the important and vital portions of which are in substance hereinabove reproduced, it is entirely clear that his possession of the property was not necessarily to be interpreted by Frances C. Wood as hostile to her rights in the common land, or so intended, since she could have assumed, and, indeed, presumed, that whatever acts of dominion he was exercising over the property was for and in behalf and with the consent of his wife, and that the benefits flowing from his activities in that particular would inure to her as well as to Melita Henley and Mason Bradfield, her other cotenants. In other words, in view of the fact that Melita Henley was an owner in cotenancy of an undivided one-fourth interest in the common property, and that George J. Henley owned no interest therein, the other cotenants had the right to assume that any improvements which George J. Henley put upon the common property were intended to be for the benefit of the common property, and, per consequence, for the common benefit of all the cotenants. But, as a matter of fact, in so far as this record discloses, the first acts of George J. Henley which constituted what might be construed into an open declaration by him to claim title to the property adversely to the interests of Frances C. Wood were in his acquisition by quitclaim deed, in July, 1917, of the state's void title to the interest of Mrs. Wood. The filing by the defendants of their answer and cross-complaint in this action, denying (by the first-named pleading) the rights of plaintiff, Frances C. Wood, as cotenant and in the last-named pleading seeking to quiet their title to the property as against the said plaintiff, upon the theory that they had acquired title thereto

by adverse possession, both under section 323 and section 325 of the Code of Civil Procedure, would perhaps be construed as an act of ouster. Previous to the filing of said pleadings, the defendants did nothing to indicate an intention to hold possession of the property adversely or in hostility to the rights of the plaintiff, Frances C. Wood. There is no testimony that either of the defendants had ever refused to permit said plaintiff to enter upon and into the possession of the common lands. There is no testimony of any declaration by the Henleys (until the time mentioned), which was communicated to said plaintiff, or to her coplaintiff, that they had any intention of claiming the undivided one-half interest of Mrs. Wood adversely to her rights. There was no express repudiation of the rights of plaintiff by the Henleys. There was no testimony that Frances C. Wood or any other person in her behalf ever made a demand, or had occasion to make a demand, upon the Henleys to be permitted to enter into the possession of the premises and participate in the enjoyment of her rights as a cotenant of the common property. There is no testimony definitely showing that, prior to the year 1917, George J. Henley or his co-defendant ever paid the taxes assessed upon the property or upon the undivided interest of Frances C. Wood. As to this, George J. Henley testified: "I paid the taxes on the other half interest at Ventura. By that I mean that I paid them at the Tax Collector's Office. I paid the taxes during the years after I bought the place," referring to the purported purchase by him of the undivided one-half interest of Mrs. Wood from the abstract company in July, 1917. If by the statement that he "paid the taxes on this half interest in Ventura to the Tax Collector," he meant to say that he paid the taxes on said interest prior to the year 1917, when he received the deed from the abstract company, he does not say for what years or for how many years, or whether for years following each other consecutively, he paid said taxes. He produced no tax receipts showing the payment by him of the taxes prior to 1911 or the years intervening between 1913 and 1917. He knew that the taxes had not been paid in the years 1911, 1912, and 1913, and also that the undivided interest in dispute had been sold to the state for such delinquencies. He did testify, however,

although producing no tax receipts to verify his statement, that after receiving the void deed to the interest in question in July, 1917, he paid the taxes assessed against it for the years 1918, 1919, 1920, and 1921. There is no satisfactory or definite showing with regard to the time during which said Henley held actual possession of the premises. It is very clear, as stated in the early part of this opinion, that his residence upon the property prior to the date on which he received the deed from the Ventura Abstract Company was intermittent—that is to say, that he would go and remain upon the premises during very brief intervals of time. Some years before he erected the stone house, he would go to the land and take out stone from the rock quarries for commercial purposes. Again, during the summer seasons, he would remain on the premises and collect rent for the use of the cabins he erected and maintained on the common property to accommodate various pleasure seekers and other itinerants desiring, for a few days, to "fish" in the stream running through the property. So far as the record shows, all these privileges were exercised by him with the consent, actually given or quiescently, of the cotenants, particularly his wife. In the absence of proof to the contrary, such would be the presumption. At any rate, those acts were not in and of themselves sufficient to warrant the presumption of an ouster, or a holding of possession adversely to the rights of the other cotenants. As to the time during which the defendants claimed to have held sole actual possession of the common property, George J. Henley testified, as above shown, that he "went on the property to live in the year 1916, right after the fire. As I remember it," he continued, "the fire occurred during the month of August." He said, however, that he "had been working on the road previous to that," referring to some year or years previous to 1916, and, continuing, added: "I went actually to work clearing in February, 1916, then I claimed it." His wife testified, as will be noted, that "he (George J. Henley) first commenced staying on the property, sleeping there, in the last of April, 1916. He did not stay there continuously after that," she proceeded to testify, "he was just there once in a while, Saturday nights when campers would be coming in there; he did not sleep there continuously; no,

he was working there whenever he had spare time." This testimony itself sufficiently supports the implied finding that George J. Henley did not actually occupy the premises or any part thereof for a period of five years continuously and uninterruptedly down to the date of the commencement of this action on May 28, 1921.

As to the act of erecting the stone house and the act of inclosing that structure by a fence, Henley himself supposed, when constructing the house, that he was locating it on a small tract of land of which he was the sole owner and this fact is strong evidence that he did not intend that the erection of the house and the fence was to constitute an act of hostility to the rights of Frances C. Wood. It may be added, in this connection, that it is not clear, from the testimony, that the house is not in fact on Henley's forty-acre tract. This consideration, it must be understood, goes entirely to the question whether the erection of the house was an act or intended as an act adverse in a legal sense to the rights of Frances C. Wood, or, in other language, whether, at the time of its erection, it was intended as the assertion by the Henleys of a claim of title to the property adversely to and in derogation of the title of Mrs. Wood.

But it is not necessary to proceed further in an examination of the testimony to show that the findings of the trial court are amply supported. Indeed, the testimony presented by the defendants in support of their claim of title to the undivided one-half interest of Mrs. Wood is vague, uncertain, and indefinite upon every element of adverse possession prescribed by section 325 of the Code of Civil Procedure which must be shown to divest a person of title to his property and vest it in another under the doctrine of adverse possession. This mode for the transference of property is, obviously, of a very delicate nature and the legislature has accordingly exercised meticulous care in providing the means for its accomplishment; and the courts have uniformly held that the provisions of our statutes under which such titles may be established must be strictly followed. As is said in *Pyramid Land etc. Co.* v. *Scott*, 51 Cal. App. 634, 646 [197 Pac. 398, 408]:

"It is safe to say that in nearly every case where title to real property is sought to be established by adverse pos-

session or prescription, which is based entirely upon the presumption of a grant of such property to the party so claiming it or to his predecessors in interest, there has in point of fact never been a grant or conveyance to the adverse claimant or his predecessors for a consideration. Hence, no person should be deprived of his property rights upon the plea of adverse possession or prescription unless such plea is sustained by the clearest and most satisfactory proof.''

To the same effect are *Clarke* v. *Clarke,* 133 Cal. 667, 669 [66 Pac. 10], *Niles* v. *Los Angeles,* 125 Cal. 576 [58 Pac. 190], and *Thomas* v. *England,* 71 Cal. 459 [12 Pac. 491].

█ The doctrine that the acquisition of title to real property by adverse possession presupposes a grant of such property does not, of course, apply to the statute of limitations, that statute being one of repose and the effect of its application being to cut off the owner's remedy for the recovery of the property or the possession thereof. But, to start the statute to running against the legal owner of the land, there must be an avowed claim of ownership by the party relying upon the statute and substantially all the elements essential to the establishment of title by adverse possession shown to exist. █ In the instant case, the claim by defendants of the running of the statute of limitations necessarily falls with the failure of the testimony to support their claim of title by adverse possession. █ It will not, of course, be denied that a party out of possession of land may maintain an action to quiet his title to such land under section 738 of the Code of Civil Procedure, and that he is not required to proceed in such an action until there has been asserted by another a claim of title thereto hostile to that of the real owner. (Code Civ. Proc., sec. 380; *Richardson* v. *Williamson,* 24 Cal. 299; *Brusie* v. *Gates,* 80 Cal. 462 [22 Pac. 284]; *Cobe* v. *Crane,* 173 Cal. 116, 119 [159 Pac. 587]; *Hyatt* v. *Colkins,* 174 Cal. 580, 581 [163 Pac. 1007]. See, also, on subject of laches in cases of this character, *Liebrand* v. *Otts,* 56 Cal. 248; *People's Water Co.* v. *Boromeo,* 31 Cal. App. 270 [160 Pac. 574]; *People's Water Co.* v. *Lewis,* 19 Cal. App. 622, 625 [127 Pac. 506].) In the last-named case it is said: ''Plaintiff, having estab-

lished a legal title to the property, is presumed to have been possessed thereof within the time required by law, and the occupation of the property by defendant to have been under and in subordination to the legal title, and this presumption can only be overcome by sufficient evidence on the part of the appellant that he had held and possessed the property adversely to such legal title for five years before the commencement of the action."

In *Hyde* v. *Redding*, 74 Cal. 500 [16 Pac. 380], it is said: "Where a plaintiff has been in possession of land, he cannot be guilty of laches in the bringing of a suit to remove a cloud at any time before an action has been brought to disturb his possession, or to deprive him of any enjoyment of his right."

Thus far the case has been considered upon the claim by the defendants of title by adverse possession not founded upon a written instrument, and, incidentally, upon the like claim of the bar of the statute of limitations.

Coming now to a consideration of the alleged claim of title by adverse possession founded on the deed received by George J. Henley from the abstract company, a conclusive answer to that claim is in the fact that the plaintiffs brought this action within five years from the date on which said company executed and delivered the quitclaim deed to the interest involved herein to George J. Henley. The deed was dated the sixth day of July, 1917, and, there being no evidence to the contrary, was presumptively delivered to Henley on that date. (Civ. Code, sec. 1055.) The plaintiffs brought this action on May 28, 1921. Thus it will be seen that plaintiffs instituted the action within less than four years after the execution and delivery of the deed to George J. Henley. The contention that the defendant George J. Henley, having acquired "color of title" under "a defective written instrument" subsequently to the time of entering into possession and occupation of the property under a claim not founded on a written instrument, "may relate his occupation under the written instrument back to the time of his original entry upon the property," is afforded no support in the record. The cases cited (*Dean* v. *Goodard*, 55 Minn. 290 [56 N. W. 1060], and *Valentine* v. *Cooley*, Meigs (Tenn.), 613 [33 Am. Dec. 166]),

conceding for present purposes only that they hold, as counsel for the defendants contend, are still not applicable to the situation as made here by the evidence, since, as above shown, there is no possession and occupation, in so far as "possession and occupation" constitutes an element in the establishment of title by adverse possession, for the claim of adverse possession under color of title to "relate back to."

The contention that the court should have allowed the defendants compensation for the improvements they put upon the property is without merit, from a legal standpoint. The first requisite for the granting of such relief is that a demand, properly set out, shall be made for such reimbursement in the pleading of the party asking for such relief. Here no claim for reimbursement for the expenditures required for the making of the asserted improvements was set up in the answer of the defendants to the complaint, or any such issue otherwise submitted or tendered. To justify such an allowance, in a proper case, it must be shown, both by pleading and proof, that the alleged "improvements" were made in good faith and that they have enhanced the value of the property sought to be recovered.

But it is clear that, under the terms of section 741 of the Code of Civil Procedure, such a plea would not be appropriate and could not be maintained in the present case. The code section named provides: "When damages are claimed for withholding the property recovered, upon which permanent improvements have been made by a defendant, or those under whom he claims, holding under color of title adversely to the claim of the plaintiff, in good faith, the value of such improvements must be allowed as a set-off against such damages."

It is plainly manifest that, under the terms of said section, in an action to recover real property, whether the remedy be either legal or equitable, a defendant cannot be allowed reimbursement for improvements made by him upon the property sought to be recovered except by way of a set-off against any damages which may be claimed by the plaintiff for the withholding of the property. (See *Ford* ·v. *Holton,* 5 Cal. 320, 332; *Huse* v. *Den,* 85 Cal. 390, 401 [20 Am. St. Rep. 232, 24 Pac. 790]; *Wise* v. *Burton,* 73 Cal.

174 [14 Pac. 683]; *Kinard* v. *Kaelin*, 22 Cal. App. 383, 389 [134 Pac. 370].)

In the case last named the rule is stated, substantially, as it had been stated in previous adjudications of the proposition, as follows: "It is the rule in actions for the recovery of real property that the value of permanent improvements made by a person holding in good faith and under a color of title adversely to the plaintiff may be allowed only as a set-off to such damages as may be claimed for the withholding of the property sued for," citing Code of Civil Procedure, section 741; *Huse* v. *Den*, 85 Cal. 390 [20 Am. St. Rep. 232, 24 Pac. 790]; 4 Sutherland's Code Pleading, section 6406.

No damages were pleaded or asked for by the plaintiffs for "withholding the property," nor, so far as her own interest was concerned, was there a "withholding of the property" by defendants. It may be added with some propriety that, if, as a legal proposition, it were permissible for defendants to claim reimbursement at the hands of Mrs. Wood for the expense to which they went in erecting the stone house, stable, fence, and road, they would find it difficult, by the evidence in this record, to persuade a court to the conviction that they acted in good faith in claiming title by adverse possession founded upon the quitclaim deed purporting to convey to George J. Henley whatever interest the state or the abstract company had acquired in the property in question, since there were circumstances from which the court could well have found that said Henley well knew, when he took the deed from the abstract company, that, in accepting the conveyance, he would not and did not thereby acquire a valid or any title to the property described in the grant. The deed itself, being a quitclaim, or conveying only such interest in the interest in dispute as the abstract company had acquired from the state, was notice to said Henley that the title thus attempted to be transferred was of dubious or doubtful validity. The letter of Ira B. Wood to the abstract company, in date anterior to the time at which the latter conveyed to George J. Henley, specifically stated that the state's title to the property was absolutely void and that said company could convey no valid title to the parties· (referring to the Henleys) to whom the agent of the com-

pany informed said Wood that said company intended to sell and transfer it. These circumstances were sufficient to create more than a mere suspicion of bad faith in George J. Henley's attempt to establish a title to said interest by adverse possession under section 323 of the Code of Civil Procedure. But, however this all may be, we think it is perfectly clear from the record before us that the findings are amply supported, and that the judgment should be affirmed. It is so ordered.

Plummer, J., and Finch, P. J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on February 18, 1928.