**Robert CIMINELLI d/b/a Smithtown Electronics, Smithtown Electronic, Inc., Plaintiffs,**

v.

**CABLEVISION, Brookhaven Cable TV Service, Inc., Viacom Cablevision of Long Island, Inc., Huntington Cable, Inc.; Group W. Cable Corp.; Cox Cable New York, Inc.; Adams Russell Cable Vision Nassau, Inc.; Long Island Cable TV Counsel; Newsday Channel; Newsday, Inc.; Dennis Dillon and Patrick Henry, Defendants.**

No. CV–83–2494.

United States District Court, E.D. New York.

Feb. 22, 1984.

Joshua Noah Koenig, Albany, N.Y., for Long Island Cable TV Council.

Choate, Hall & Stewart, Boston, Mass., for defendant Adams Russell Cablevision-Nassau, Inc.

Edward G. McCabe, Mineola by Peter Skelos, Rockville Centre, N.Y., for defendant Dennis Dillon.

Martin Bradley Ashare, Patchogue, N.Y., by Robert Cimino, Hauppauge, N.Y., for defendant Patrick Henry.

Young & DeWitt, West Babylon, N.Y., for plaintiff.

Sullivan & Cromwell by Michael A. Cooper, Yvonne S. Quinn, New York City, Joseph F. Carlino, P.C. by Joseph F. Carlino, Mineola, N.Y., for defendant Cablevision.

Pelletreau & Pelletreau, Patchogue, N.Y., for defendant Brookhaven Cable TV Service, Inc.

Hughes, Hubbard & Reed by John C. Fontaine, New York City, for defendant Viacom Cablevision of Long Island.

Toaz, Buck, Myers, Bernst, Young & Cote, Huntington, N.Y., for defendant Huntington TV Cable Corp.

Weil, Gotshal & Manges by R. Bruce Rich, Robert F. Brodegaard, New York City, for defendants Newsday, Inc., Newsday Channel and Group W Cable Corp.

Peirez, Ackerman & Levine by John M. Brickman, Great Neck, N.Y., Dow, Lohnes & Albertson, Washington, D.C., for defendant Cox Cable New York, Inc.

ALTIMARI, District Judge.

By complaint dated June 10, 1983, plaintiff Robert Ciminelli d/b/a Smithtown Electronics (hereinafter "Ciminelli"), commenced the instant action against seven cable television companies operating on Long Island (hereinafter collectively referred to as the "cable companies"), Newsday, Inc., Newsday Channel, the Long Island Cable T.V. counsel, and Dennis Dillon and Patrick Henry, respectively the District Attorneys of Nassau and Suffolk Counties.

Pursuant to leave of the Court granted on January 10, 1984, on January 24, 1984, plaintiff amended his complaint to add two new causes of action, change the legal underpinning of one "old" cause of action, and otherwise conform his pleadings to his position in his papers and at oral argument before the Court. In addition, the amended complaint reflects the addition of Smithtown Electronics, Inc., as a plaintiff.

## THE AMENDED COMPLAINT

For a first cause of action, plaintiffs allege that the cable companies require subscribers to "accept and use only those cable accessories provided by [them] on a rental basis." Comp. par. 220. This, they allege, "constitutes an illegal tying arrangement or requirement, the tying product being the cable and the tied product being the cable accessory." Par. 222. Plaintiffs allege that this arrangement "affords the cable companies a monopoly in the retail cable accessory market ... thereby totally eliminating competition in that market and plaintiff of entry into and par-

ticipation in the cable accessory market...." Par. 224. This conduct is alleged to be violative of 15 U.S.C. sections 1, 14 and 15. For a second cause of action, plaintiffs allege that Ciminelli, as a subscriber to Viacom Cablevision of Long Island, Inc. ("Viacom"), is "permitted to use his privately owned converter and descrambler [but] nevertheless [has] to pay the same rate as subscribers who [are] provided cable accessories to rent from the cable companies." Par. 228. Plaintiffs allege that this conduct is violative of 15 U.S.C. Sections 1 and 14. Pars. 229, 102 and 103.

For a third cause of action, plaintiffs allege that on or about April 12, 1983, Ciminelli, doing business as Smithtown Electronics, entered into a contract with Newsday Channel, leasee of channels from other cable companies including Cablevision, Viacom, and Brookhaven, to purchase advertising for the cable accessories it offered for sale. Pars. 228–30, 232. These commercials subsequently were aired on May 1st, 2nd and 3rd of 1983. Plaintiffs allege that "[a]fter telecasting these commercials on [May 1st, 2nd and 3rd], the Newsday Channel refused to telecast them and canceled their advertising contract notwithstanding the fact that the contract ... had in excess of 51 weeks before its expiration." Par. 234. Plaintiffs further allege that in January of 1984 they "sought to purchase advertising on the Viacom system for the sale of cable accessories at issue in this action, but excluding descramblers and decoders and was refused such permission." Par. 235. Plaintiffs claim that "[t]he actions of Newsday, the Newsday Channel, Cablevision and Viacom" are the result of a conspiracy among said defendants to engage in a concerted refusal to deal with plaintiff for purposes of advertising for sale cable accessories in order to restrain competition between plaintiff as a competitor of Cablevision and Viacom in the cable accessory market." Par. 236. Plaintiffs allege that the above actions "constitute a conspiracy to impose a group boycott of plaintiff as the target of a conspiracy to restrain trade in the cable accessory market and is a *per se* violation of

Section 1 of the Sherman [Act], 15 U.S.C. Section 1." Par. 237.

For a fourth cause of action, plaintiffs allege that effective September 1, 1983, "[t]he legislature of the State of New York has enacted certain statutes which make it a crime to engage in the retail sale of cable accessory equipment," and which casts plaintiffs in criminal jeopardy for engaging in such sales." Pars. 239–40. Plaintiffs assert that the penal statute "eliminates the market for private purchase of cable accessories giving the cable companies a monopoly in the market for cable accessories," par. 242, and, therefore, is violative of the Supremacy and Commerce Clauses of the United States Constitution, and the Federal Antitrust Laws. Par. 250.

For a fifth cause of action, plaintiffs allege that Smithtown Electronics, as a retailer of cable accessories, has been damaged by the cable companies' policy of not allowing a rate reduction to subscribers who use their own private cable accessory equipment. Plaintiffs allege that the above constitutes price discrimination in violation of Section 2 of the Clayton Act as amended by the Robinson Patman Act, 15 U.S.C. Section 13(a). Finally, plaintiffs' sixth cause of action alleges that Ciminelli failed to receive a price reduction from Viacom when he subscribed to its full line of service on the condition that he use his own cable accessory equipment. "Instead, [he] was charged the same rate as subscribers using accessories provided by the cable companies." Par. 266. Plaintiffs claim that the above constitutes price discrimination in violation of Section 2 of the Clayton Act as amended by the Robinson Patman Act, 15 U.S.C. Section 13(a).

On the first and second causes of action, plaintiffs seek an injunction against the further enforcement of the alleged tying arrangement as well as, in the first cause of action, money damages. On the third cause of action, they seek damages for loss of reputation and good name, as well as loss of profit. On the fourth cause of action, plaintiffs seek a declaration that N.Y. Penal Law section 165.15(4) is viola-

tive of their civil rights and an injunction enjoining enforcement of the same. On the fifth and sixth causes of action, they seek injunctive and monetary relief. In addition, plaintiffs purport to bring the action, specifically counts one, two, five and six, on behalf of a class of which they are members.

On January 10, 1984, the parties appeared in court for argument of all pending motions. Since we granted plaintiff leave to amend his complaint at that time, we also noted that to the extent appropriate, the pending motions would be deemed directed against the amended complaint. This memorandum and order constitutes our decision of the cross-motions for summary judgment on the fourth cause of action and the motions of defendants Henry and Dillon to dismiss.

## I.

## THE PARTIES' CROSS MOTIONS FOR SUMMARY JUDGMENT ON THE FOURTH CAUSE OF ACTION.

The parties cross-move for summary judgment pursuant to Rule 56, Fed.R. Civ.P., with respect to plaintiffs' fourth cause of action which seeks a judgment declaring New York Penal Law section 165.15(4), as recently amended, pre-empted by the Sherman Act and the FCC's regulation of the cable industry. *See* 10A Wright, Miller and Kane, *Federal Practice and Procedure*, § 2768 at 753–54 (1983) ("Summary judgment is as available in [declaratory judgment] actions as in any others.") As for their relief, plaintiffs ask that the Court grant an injunction enjoining defendants Dillon and Henry from enforcing that law.

In both their memorandum of law and at oral argument on January 10th, plaintiffs abandoned their claims that New York Penal Law § 165.15(4) deprived them of due process or equal protection of the laws, violated the Commerce Clause of the U.S. Constitution, and gave rise to a cause of action under the Civil Rights Act, 42 U.S.C. § 1983. Plaintiffs now maintain that in

direct conflict "with the policies of Congress as expressed in the Sherman Act and Clayton Act antitrust laws, as well as the regulatory scheme imposed by the Federal Communications Commission," the statute grants the cable companies an unrestricted and unsupervised monopoly in the market for cable accessories. *See also,* Affidavit of Robert Ciminelli dated September 20, 1983, paragraphs 70–71, ("The provisions of Penal Law Section 165.15 sub. 4 .... is alleged to be unconstitutional under the supremacy clause of the United States Constitution as being violative of the antitrust laws .... Plaintiff also seeks injunctive relief against prosecutions by the Nassau/Suffolk District Attorney....") They suggest, therefore, that the statute cannot withstand attack under the Constitution's Supremacy Clause. It was in light of the above arguments that the Court granted plaintiff leave at oral argument to amend the complaint to conform to the claims actually being pursued.

In response to plaintiffs' motion and in support of their cross-motion, defendants argue that "Section 165.15(4) represents an entirely appropriate exercise of the sovereign powers of the State of New York, and because that exercise of power in no way conflicts with any federal law or policy, plaintiff's motion should be denied and defendants' cross-motion for summary judgment dismissing the fourth claim granted."

### A. FACTS

A concise description of the practices of and services offered by the cable companies is provided by the affidavit of Joshua Noah Koenig, Vice President and counsel to the New York State Cable Television Association and attorney for defendant Long Island Cable Television Council. (Affidavit of Joshua Noah Koenig in opposition to plaintiff's motion for class certification par. 1, hereinafter "Koenig Aff.").

The cable companies in this action are in the business of offering television programming services to home subscribers pursuant to franchises granted by local municipalities and villages. (Koenig Aff.

par. 4; N.Y.Exec.Law § 819 (McKinney 1982)).

Subscribers are free to select the level and combination of services they wish to receive from the cable company, based, of course, on their viewing preferences and, more likely, on how much they wish to spend. To this end, the cable companies offer, as a minimum level of service, what is referred to as basic service. While the content of basic service varies from one cable company to another, it generally consists of local broadcast television signals, and local government and public access programming. (Koenig Aff. par. 7). It may also include distant broadcast stations and, moreover, news, sports, music and whether channels, and a channel for financial market reports. (*Id.*) Finally, a number of cable companies install the subscriber's converter, *see* p. 151 *infra*, as part of a basic service package. (*Id.*)

For those subscribers who seek greater television viewing pleasure, additional or optional tiers of programming services are available, albeit at an additional charge. (Koenig Aff. par. 8). Thus, subscribers may purchase so-called premium or pay channels, such as Home Box Office or Cinemax. These pay services offer programs and features not otherwise available to television viewers, such as first-run movies, special entertainment programs, boxing and other programs. The available premium services vary from cable company to company. Moreover, subscription to these optional tiers necessitates, in most circumstances, installation of a converter, if heretofore no converter was had for basic services, or a different type of converter than that which was installed and used for proper reception of basic service. (Koenig Aff. par. 8–10).

It is critical to understand the manner in which services are delivered or transmitted to subscribers. The cable companies furnish to home subscribers within their franchise area television programs by way of a network of coaxial cable. As described by Mr. Koenig:

"The system begins at the headend, which is the central transmission point of each companies' cable system, from which cable television programming is disseminated to subscribers. The final branches of this cable network are the drop cables and other related equipment that run onto the subscriber's premises and link subscribers's television receivers to the system for those subscribers who request and pay for some level of cable television service."

(Koenig Aff. par. 11). Included within the other related equipment category are devices commonly referred to as converters, decoders and descramblers. A converter increases the channel capacity of the standard television receiver beyond channels 2–13. Thus, it enables the subscriber's television set to receive a number of additional channels. More importantly, the converter also electronically screens out channels for which the subscriber has not so subscribed. In defendants' words, it "filters out" channels which the subscriber has not made a request and paid for. (Koenig Aff. par. 12).

In addition, certain premium programming is transmitted by way of a scrambled or encoded signal. For reception of an intelligible picture, the subscriber requires, in addition to a converter, a device termed a decoder or descrambler. When a subscriber initially is hooked up to a cable system, the company installs the cable and equipment commensurate with the services that have been subscribed to. Therefore, as can be clearly gathered from the above, when a subscriber wishes to subscribe either to a higher or lower tier of programming, he must exchange his existing equipment for new equipment necessary for reception of the level of service that has been requested. (Koenig Aff. par. 13–14).

### B. NEW YORK PENAL LAW

#### Section 165.15(4)

We start with the statute upon which plaintiffs seek to sustain an assault. Section 165.15 of the New York Penal Law is titled theft of services. Prior to amend-

ment of the above section in 1975, subsection (4) read as follows:

"A person is guilty of theft of services when:

\*　　\*　　\*　　\*　　\*　　\*

4. With intent to avoid payment by himself or another person of the lawful charge for any telecommunications service, he obtains or attempts to obtain such service or avoids or attempts to avoid payment therefor by himself or another person by means of (a) tampering or making connection with the equipment of the supplier, whether by mechanical, electrical, acoustical or other means, or (b) any misrepresentation of fact which he knows to be false, or (c) any other artifice, trick, deception, code or device;"

In 1975, subsection (4) was amended to add the words "cable television service" following the words "telecommunications service." 1975 N.Y.Laws Ch. 530. The statute thus clearly and explicitly proscribed the theft of cable television services. The practice commentary to the section states that:

"The amendment was sponsored by the Cable Television Commission which, apparently, considered that the development of cable television use in this State has been inhibited by widespread theft of cable television services. One estimate is that as many as 100,000 people in New York State may be getting cable services without paying for it. Obviously, a serious theft problem exists ...."

N.Y.Penal Law § 165.15(4), commentary at 89 (McKinney Supp.1983). Indeed, the practice commentary notes that while the term "telecommunications", as defined, "means: 'communication at a distance (as by cable, radio, telegraph, telephone or television)' (Webster's Third New International Dictionary, unabridged)", and, therefore, seemingly included the subject of the amendment, nevertheless the "subdivision was amended to make clear that the theft of 'cable television services' was included within its scope." *Id.*, commentary at 87, 89–90. The necessity for the legislature to *make clear* that the theft of cable services fell within the statute's scope, viewed in conjunction with the estimated extent of the theft, underscores the seriousness with which the legislature viewed the problem of theft of cable services in 1975. A seriousness which persuaded it to make clear—though surely one could not otherwise mistake it—, by insertion of unmistakable words, that criminal penalties would be imposed upon those who obtained or attempted to obtain cable television services with the intent to avoid payment by themselves or others. *See also,* Memorandum of Cable T.V. Commission in support of ch. 530, *reprinted* in [1975] N.Y.Legis.Ann. 87:

"The New York State Cable Television Association has estimated that as many as 100,000 people throughout the State may be receiving various types of cable service without paying for it. These dishonest activities harm not only the cable operators, but also the honest subscribers who may ultimately be asked to make up the lost revenue through higher rates and who may be deprived of desired supplemental programming if theft of that programming makes its continued provision economically impractical. Moreover, the State itself, which taxes cable companies and also recovers from them the cost of cable regulation up to a maximum of one percent of each company's gross annual revenues, suffers direct financial loss as a result of the theft of cable services...

The bill would also provide that a person obtaining or attempting to obtain any telecommunications service for *another person* without payment would be guilty of a Class A misdemeanor. This amendment is intended to assure that the law reaches the 'professional thieves' whose activities account for the serious proportions of the problem."

After further amendment of subsection (4) of the statute in 1978, 1978 N.Y.Laws ch. 420, not relevant to this action, the subsection read as follows:

"A person is guilty of theft of services when:

4. With intent to avoid payment by himself or another person of the lawful charge for any telecommunications service, including, without limitation, cable television service, or any gas, steam, sewer, water electrical, telegraph or telephone service, or any gas, steam, sewer, water, electrical, telegraph or telephone service which is provided for a charge or compensation, he obtains or attempts to obtain such service for himself or another person or avoids or attempts to avoid payment therefor by himself or another person by means of (a) tampering or making connection with the equipment of the supplier, whether by mechanical, electrical, acoustical or other means, or (b) any misrepresentation of fact which he knows to be false, or (c) any other artifice, trick, deception, code or device."

N.Y. Penal Law § 165.15(4) (McKinney 1975 and Supp.1982).

The subsection remained unchanged until 1983, when it was substantially amended, 1983 N.Y. Laws ch. 522. Effective September 1, 1983, the statute reads as follows:

"A person is guilty of theft of services when:

4. With intent to avoid payment by himself or another person of the lawful charge for any telecommunications service, including without limitation, cable television service, or any gas, steam, sewer, water, electrical, telegraph or telephone service which is provided for a charge or compensation, he obtains or attempts to obtain such service for himself or another person or avoids or attempts to avoid payment therefor by himself or another person by means of (a) tampering or making connection with the equipment of the supplier, whether by mechanical, electrical, acoustical or other means, or (b) offering for sale or otherwise making available, to anyone other than the provider of a telecommunications service for such service provider's own use in the provision of its service, any telecommunications decoder or descrambler, a principal function of which defeats a mechanism of electronic signal encryption, jamming or individually addressed switching imposed by the provider of any such telecommunications service to restrict the delivery of such service, or (c) any misrepresentation of fact which he knows to be false, or (d) any other artifice, trick, deception, code or device. For the purposes of this subdivision the telecommunications decoder or descrambler described in paragraph (b) above or the device described in paragraph (d) above shall not include any non-decoding and non-scrambling channel frequency converter or any television receiver type-accepted by the federal communications commission. In any prosecution under this subdivision, proof that telecommunications equipment, including, without limitation, any cable television converter, descrambler, or related equipment, has been tampered with or otherwise intentionally prevented from performing its functions of control of service delivery without the consent of the supplier of the service, or that telecommunications equipment, including, without limitation, any cable television converter, descrambler, receiver, or related equipment, has been connected to the equipment of the supplier of the service without the consent of the supplier of the service, shall be presumptive evidence that the resident to whom the service which is at the time being furnished by or through such equipment has, with intent to avoid payment by himself or another person, for a prospective or already rendered service, created or caused to be created with reference to such equipment, the condition so existing. A person who tampers with such a device or equipment without the consent of the supplier of the service is presumed to do so with intent to avoid, or to enable another to avoid, payment for the service involved. In any prosecution under this subdivision, proof that any telecommunications decoder or descrambler, a principal function of which defeats a mechanism of electronic signal encryption, jamming or individually addressed switching imposed by the provider or any such

telecommunications service to restrict the delivery of such service, has been offered for sale or otherwise made available by anyone other than the supplier of such service shall be presumptive evidence that the person offering such equipment for sale or otherwise making it available has, with intent to avoid payment by himself or another person of the lawful charge for such service, obtained or attempted to obtain such service for himself or another person or avoided or attempted to avoid payment therefor by himself or another person;"

N.Y. Penal Law § 165.15(4) (McKinney Supp.1983). As amended, the statute now prohibits the offering for sale (and assumedly the sale), to anyone other than the provider of a telecommunications service (a cable company) for such provider's own use in the provision of its service, of any telecommunications decoder or descrambler, "a principal function of which defeats a mechanism of electronic signal encryption, jamming or individually addressed switching imposed by the provider of any such telecommunications service to restrict the delivery of such service." Such sale must be with the "intent to avoid payment by himself or another person of the lawful charge for ... cable television service ...." In this respect, the statute creates a presumption that one who offers the subject equipment for sale does so with the intent to avoid payment of the lawful charge by himself or another. In effect, the statute completely prohibits anyone, including the cable companies, from selling, offering for sale, or otherwise making available, to anyone other than a cable company, decoders or descramblers. (The statute does not prohibit the sale of non-decoding and non-descrambling converters or any television receiver accepted by the Federal Communications Commission.)

The legislative history of the 1983 amendment of N.Y. Penal Law section 165.-15(4), while apparently sparse, illuminates the amendment's moving force. The memorandum of Senator Dale M. Volker and Assemblyman Melvin N. Zimmer in support of the legislation states that:

"Theft of telecommunications services is a *multimillion dollar problem each year in New York State and a multibillion dollar problem nationally.* Cable television companies alone are losing *at least thirty million dollars a year* in New York State to service thefts. Currently, it is estimated that about ten percent (10%) of cable service usage in New York is unauthorized and unpaid for. The loss of service revenues through theft is a direct burden not only on the hundreds of local operating companies in the state, but also on their legitimate subscribers, whose service charges are necessarily increased, and to local governments, whose revenues are decreased (cable television companies usually pay annual fees of up to five percent of gross receipts). This problem also represents an indirect burden for the state government, as state taxes are not collected on the missing service revenues. Wrongful service connections are often harmful to the quality of services provided to legitimate subscribers and can cause problems of electronic signal leakage and communications interference disruptive to non-subscribers and even potentially dangerous to public safety."

Memorandum of Senator Volker and Assemblyman Nimmer in support of N.Y.S. 4066, N.Y.A. 4056 at 2 (emphasis not added) (the memorandum is contained within the Governor's Bill Jacket to 1983 N.Y. Laws ch. 521, which bill jacket is on file in the office of the Counsel to the Governor). More importantly, the memorandum adds that "[t]he bill would reconfirm legislative intent that merchants of such equipment are fully liable for the theft of services by their customers." *Id.* at 3.

In addition, the Chairman of the New York State Commission on Cable Television, which state agency oversees the development of the cable television industry in New York State, N.Y.Exec.Law § 811 *et seq.* (McKinney 1982), and which agency worked with the various legislative committees, the State Attorney General, the Governor's Counsel and the New York State

Cable Television Association on the amendment of section 165.15(4), by affidavit states that the Commission "has supported for several years the enactment of strict and effective legislation to control the growing problem of cable service theft." (Affidavit of William B. Finneran in support of defendants' cross-motion for summary judgment on the fourth cause of action, (par. 3–4) hereinafter "Finneran Aff."). This support, he states, has been grounded in the Commission's recognition of the "pernicious increase" of cable service theft and "its deleterious effects on the legitimate interests of local governments, legitimate service subscribers and the lawful operations of enfranchised cable television companies." (*Id.*) Indeed, he points to industry estimates of service thefts approaching ten percent (10%) of all services actually received, and potential revenue losses of upwards of thirty million dollars ($30,000,000) per year in New York State alone. He continues that:

"concern has remained acute due to [its] [the Commission's] observation that municipal governments have lost millions of dollars from such thefts out of their direct revenues from cable service sales and their lost taxes on cable company income, and [its] observation that legitimate subscribers are significantly harmed by the theft of others through service rate increases, restrictions or postponements in the improvement of services, and through the immediate and quite common degeneration of service quality caused by inartful theft attempts."

(Finneran Aff. par. 3). Thus, the Commission wholly supported and still supports the amendment of section 165.15(4).

Further insight into the 1983 amendment of subdivision (4) is provided by the practice commentary which notes that:

"In 1975 this subdivision was amended to make clear that the theft of 'cable television services' was included within its scope. Presumably, that didn't have the

desired impact, leading to the instant amendments."

Commentary at 87.

Having reviewed the statute, the Court next turns to the issue of whether it can withstand the plaintiffs' challenge.

The thrust of plaintiffs' argument is that N.Y. Penal Law Section 165.15(4) "is directly in conflict with the policies of Congress as expressed in the Sherman Act and Clayton Act antitrust laws. Thus, plaintiffs argue that the section "must give way under the Constitution's Supremacy Clause." The issue raised is whether section 165.15(4) is pre-empted by the Sherman and Clayton Acts or, stated otherwise, whether it is immune or exempt from antitrust challenge under the state action doctrine? More specifically, in the fourth cause of action, plaintiffs seek to enjoin the District Attorneys of Nassau and Suffolk Counties, state officers in the enforcement of the laws of the State of New York, *Spielman Motor Sales Co. v. Dodge*, 295 U.S. 89, 55 S.Ct. 678, 79 L.Ed. 1322 (1935), from enforcing section 165.15(4). It does no violence to plaintiffs' complaint to conclude that plaintiffs' claim is directed against the State of New York, seeking to enjoin the State itself from enforcing its criminal laws. No doubt in this cause of action, the State is the real party in interest.

## C. THE STATE ACTION DOCTRINE

The origin of the state action doctrine can be traced back to *Olsen v. Smith*, 195 U.S. 332, 345, 25 S.Ct. 52, 55, 49 L.Ed. 224 (1904), and *Standard Oil Co. v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). *See Eastern R.R. Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); Handler, *The Current Attack on the Parker v. Brown State Action Doctrine*, 76 Colum.L. Rev. 1, 7–10 (1976). It was not, however, until the Supreme Court's decision in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), that the doctrine received great attention or comment.

In *Parker*, a California producer and packer of raisins sought to enjoin enforce-

ment of the California Agricultural Prorate Act enacted by the California Legislature as a marketing program to be enforced "through action of state officials ... to restrict competition among the growers [of raisins] and maintain prices in the distribution of their commodities to packers." *Id.* at 346, 63 S.Ct. at 311. His reasoning was that the program was a contract, combination and conspiracy in restraint of trade and an attempt to monopolize the raisin industry in violation of Sections 1 and 2 of the Sherman Act.

The Supreme Court upheld the marketing program since "nothing in the language of the Sherman Act or in its history ... suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature," *id.* at 350–51, 63 S.Ct. at 313, and "[t]he state ... a sovereign, imposed the restraint as an act of government which the Sherman Act did not undertake to prohibit." *Id.* at 352, 63 S.Ct. at 314.

Some thirty-two years later, beginning with *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), the Supreme Court began to explore and define the *Parker* doctrine and its application. *See, e.g. Community Communications Co. v. City of Boulder,* 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982); *California Retail Liquor Dealers' Assn. v. Midcal Aluminum, Inc.,* 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980); *New Motor Vehicle Bd. of Calif. v. Orrin W. Fox Co.,* 439 U.S. 96, 99 S.Ct. 403, 58 L.Ed.2d 361 (1978); *City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978); *Bates v. State Bar of Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977); *Cantor v. Detroit Edison Co.,* 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976).

It is critical to note, however, that in not one of these cases was the Court presented with the question of whether the State itself, or its officers, could claim state action immunity. Nor did any case imply that the state acting in its sovereign capacity should be denied antitrust immunity.

*See Parker v. Brown, supra.* Instead, these cases focused on the availability of state action immunity to private parties, political subdivisions, or subordinate governmental agencies.

For example:

In *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), the issue was whether a minimum fee schedule for attorneys published by the Fairfax County Bar Association, a voluntary association of lawyers, and enforced by the Virginia State Bar, a state agency by law, constituted price fixing in violation of the Sherman Act. Both the County Bar Association and the Virginia State Bar sought to avail themselves of state action immunity. The Court denied such immunity finding that "it cannot fairly be said that the State of Virginia ... required the anticompetitive activities of either ...." *Id.* at 790, 95 S.Ct. at 2015. Instead, the Court concluded that the State Bar, by enforcing the fee schedule of the County Bar, "had voluntarily joined what [was] essentially a private anticompetitive activity ...." *Id.* at 791–92, 95 S.Ct. at 2015. It is not enough for immunity to apply, stated the Court, that the activities of a state agency or private party are prompted by state action; rather, their "activities must be compelled by direction of the State acting as sovereign." *Id.* at 791, 95 S.Ct. at 2015.

In *Cantor v. Detroit Edison Co., supra,* 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976), the Supreme Court held that the mere approval by the State of anticompetitive activity by private parties does not immunize such private parties, without a showing that the conduct was required by the State acting in its sovereign capacity.

In *Bates v. State Bar of Arizona, supra,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977), the issue was whether the Supreme Court of Arizona, in enforcing a disciplinary rule restricting advertising by lawyers as part of its regulation of the State bar, violated the Sherman Act. The question presented was whether the Sherman Act claim was barred by the *Parker* state action exemption. In answering that ques-

tion in the affirmative, the Court noted that since the Arizona Supreme Court is the "ultimate body wielding the State's power over the practice of law," the "restraint is compelled by direction of the State acting as sovereign." *Id.* at 360, 97 S.Ct. at 2697. *Cf. Goldfarb v. Virginia State Bar, supra,* 421 U.S. at 791, 95 S.Ct. at 2015. In addition, the Court pointed out that the real party in interest against whom the claim was directed was the Arizona Supreme Court, "the ultimate body wielding the State's power over the practice of law," as opposed to a private party, *cf. Cantor v. Detroit Edison Co., supra;* that the regulation of the activities of the bar was at core of the State's power to protect the public; and, finally, that the disciplinary rules "reflect[ed] a clear articulation of the State's policy with regard to professional behavior ... [and were] subject to pointed re-examination." *Id.* 428 U.S. at 362, 97 S.Ct. at 2698. The Court found it significant that the state policy [was] so clearly and affirmatively expressed and that the State's supervision [was] so active." *Id.*

In *City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978), the Supreme Court held that all governmental entities, whether state agencies or subdivisions of a state, are not automatically by reason of their status as such exempt from the antitrust laws. *Id.* at 408, 98 S.Ct. at 1134. Instead, a municipality may be exempt if in engaging in anticompetitive conduct, it is acting "pursuant to state policy to displace competition with regulation or monopoly public service." *Id.* at 413, 98 S.Ct. at 1137. The Court continued that "in the absence of evidence that the State authorized or directed a given municipality to act as it did, the actions of a particular city hardly can be found to be pursuant to 'the state['s] command', or to be restraints that 'the state ... as sovereign' imposed." *Id.* at 414, 98 S.Ct. at 1137, *citing Parker v. Brown,* 317 U.S. at 352, 63 S.Ct. at 314. Significantly, the Court reaffirmed "that the *Parker* doctrine exempts ... anticompetitive conduct engaged in as an act of government by the State as sovereign

...." 435 U.S. at 413, 98 S.Ct. at 1137. *See also, Id.* at 427, 98 S.Ct. at 1144 (Stewart, J., dissenting) ("[T]he plurality has effectively limited the governmental action immunity of the *Parker* case to the acts of a state legislature.")

In *New Motor Vehicle Board v. Orrin W. Fox Co.,* 439 U.S. 96, 99 S.Ct. 403, 58 L.Ed.2d 361 (1978), the challenge was to a California statute which required "an automobile manufacturer who [proposed] to establish a new retail automobile dealership in the State, or to relocate an existing one, ... to give notice of such intention to the California New Motor Vehicle Board and to each of its existing franchises ... within the 'relevant market area.'" *Id.* at 103, 99 S.Ct. at 408. If any such franchisee protested to the Board within 15 days, the franchisor was informed that a good cause hearing was required and that pending such hearing the proposed dealership was not to be established or relocated. *Id.,* 99 S.Ct. at 408–09. The Court stated that:

"The narrow question before us ... is whether California may, by rule or statute, temporarily delay the establishment or relocation of automobile dealerships pending the Board's adjudication of the protests of existing dealers. Or stated conversely, the issue is whether ... the right to franchise without delay is the sort of interest that may be suspended only on a case-by-case basis through prior individualized trial-type hearings."

*Id.* at 106, 99 S.Ct. at 410.

In response to the contention that the California statute conflicted with the Sherman Act by giving effect to privately initiated restraints on trade, in that it allowed the protest of competing dealers to delay the establishment of dealerships, the Court stated that the state statute's "regulatory scheme is a system of regulation, clearly articulated and affirmatively expressed, designed to displace unfettered business freedom in the matter of the establishment and relocation of automobile dealerships. The regulation is therefore outside the reach of the antitrust laws under the 'state action' exemption." *Id.* at 109, 99 S.Ct. at 412.

Finally, recognizing the statute's anticompetitive effects, the Court concluded that "if an adverse effect on competition were, in and of itself, enough to render a state statute invalid, the State's power to engage in economic regulation would be effectively destroyed." *Id.* at 111, 99 S.Ct. at 412.

In *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980), the challenge was to California's resale price maintenance and price posting statutes for the wholesale wine trade which required all wine producers, wholesalers, and rectifiers to file fair trade contracts or price schedules with the State. A licensed wholesaler selling below the price established by the manufacturer was subject to fines, license suspension, or outright license revocation. Plaintiff, a wholesale distributor of wine, sought an injunction against California's wine pricing system.

The question before the Court was "whether the State's involvement in the price-setting program [was] sufficient to establish antitrust immunity under *Parker v. Brown* ...." *Id.* at 103, 100 S.Ct. at 942. After briefly reviewing its past decisions, the Court stated that

> "These decisions establish two standards for antitrust immunity under *Parker v. Brown.* First, the challenged restraint must be 'one clearly articulated and affirmatively expressed as state policy'; second, the policy must be 'actively supervised' by the State itself."

*Id.* at 105, 100 S.Ct. at 943 (citation omitted). Applying the above test, the Court found that California's program did not meet the second prong:

> "The State simply authorizes price setting and enforces the prices established by private parties. The State neither establishes prices nor reviews the reasonableness of the price schedules; nor does it regulate the terms of fair trade contracts. The State does not monitor market conditions or engage in any 'pointed re-examination' of the program."

*Id.* at 105–06, 100 S.Ct. at 943. Pointing to its decision in *Parker,* wherein the Court held that " 'a state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful,' " 317 U.S. at 351, 63 S.Ct. at 314, the Court concluded that "[t]he national policy in favor of competition cannot be thwarted by casting such a gauzy cloak of state involvement over what is essentially a private price-fixing arrangement." 445 U.S. at 106, 100 S.Ct. at 943. Thus, the private parties were denied a "state action" exemption.

Most recently, in *Community Communications Co. v. City of Boulder,* 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982), the Court addressed the issue of "whether a 'home rule' municipality, granted by the state constitution extensive powers of self-government in local and municipal matters, enjoys the 'state action' exemption from Sherman Act liability ...." *Id.* at 43, 102 S.Ct. at 836. The facts showed that defendant, City of Boulder, was organized as a "home rule" municipality under the Constitution of the State of Colorado. This meant that the city enjoyed the "full right of self-government in both local and municipal matters," its City Charter and ordinances superseding any conflicting laws of the State. Plaintiff, a provider of cable television service to an area of Boulder, under a 20-year revocable nonexclusive permit, sought to expand its business into other areas of Boulder. The Boulder City Council, in response to this and in response to the interest of a company desirous of providing competing cable television service throughout the city, enacted an emergency ordinance prohibiting plaintiff from expanding its business into other areas of the city for a period of three months. This was to allow it to draft a model cable television ordinance and to invite new business into the market. The three month moratorium on expansion was thought necessary to prevent potential competitors from being discouraged to enter the market. Plaintiff commenced suit alleging that the City's acts violated § 1 of the Sherman Act.

Again reviewing its prior decisions, the Court stated that:

> "Our precedents ... reveal that Boulder's moratorium ordinance cannot be exempt from antitrust scrutiny unless it constitutes the action of the State of Colorado itself in its sovereign capacity, see *Parker, or* unless it constitutes municipal action in furtherance or implementation of clearly articulated and affirmatively expressed state policy, see *City of Lafayette, Orrin W. Fox Co. and Midcal.*"

*Id.* at 52, 102 S.Ct. at 841. (Emphasis added.) Finding that the State of Colorado's relationship to the moratorium ordinance was one of precise neutrality, the Court concluded that Boulder's moratorium ordinance did not satisfy the "clear articulation and affirmative expression" prong of the *Midcal* test. *Id.* at 56, 102 S.Ct. at 843. Thus, *Parker* exemption was denied.

In the instant case, plaintiffs principally focus on the second prong of the *Midcal* test, arguing that there is no supervision by the state of the market for cable accessories. In addition, they contend that "the amendments to Section 165.15, Subdivision 4, serve no legitimate state interest but solely the interests of private entities, the cable companies." We disagree.

 First, having reviewed the Supreme Court's decisions in this area, we believe that the *Midcal* test is not applicable to this action. A fair reading of the cases shows that the *Midcal* test was intended for those cases where it was feared that "a gauzy cloak of state involvement" was being cast over an essentially private proprietary interest seeking to shield itself from antitrust liability. *Serlin Wine & Spirit Merchants, Inc. v. Healy*, 512 F.Supp. 936, 941 n. 15 (D.Conn.), *aff'd sub nom. Morgan v. Division of Liquor Control*, 664 F.2d 353 (2d Cir.1981). We do not believe the test was intended for those cases where suit is brought against the state or its officers, seeking to restrain them from activities authorized by the legislature. Certainly, it was not intended to restrain the state from exercising its police powers and its officers from enforcing otherwise valid criminal laws. *See e.g., Exxon Corp. v. Maryland*, 437 U.S. 117, 133, 98 S.Ct. 2207, 2218, 57 L.Ed.2d 91 (1978) ("[I]f an adverse effect on competition were, in and of itself, enough to render a state statute invalid, the state's power to engage in economic regulation would be effectively destroyed."); Areeda, *Antitrust Immunity for "State Action" After Lafayette*, 95 Harv.L.Rev. 435, 439 (1981) ("[I]t is difficult to argue that antitrust law can or should decide how governments are to exercise ... police powers.") Indeed, the Supreme Court's most recent exposition on the subject bears this out. In *Community Communications Co., supra,* the Court reaffirmed that the precept of state action immunity is applicable when (1) *the activities constitute the action of the state in its sovereign capacity.* 455 U.S. at 52, 102 S.Ct. at 841 (emphasis added); *see, City of Lafayette v. Louisiana Power & Light Co., supra,* 435 U.S. at 413, 98 S.Ct. at 1123. This proposition, moreover, is not without recognition by the lower courts. *See Feldman v. Gardner,* 661 F.2d 1295 (D.C.Cir.1981), *cert. denied,* 458 U.S. 1106, 102 S.Ct. 3483, 73 L.Ed.2d 1366 (1982); *Ajax Aluminum v. Goodwill Industries of Muskegon County,* 564 F.Supp. 628 (W.D. Mich.1983); *see also, Jonnet Development Corp. v. Caliguiri,* 558 F.Supp. 962 (W.D. Pa.1983); *Deak-Perera Hawaii, Inc. v. Department of Transportation, Hawaii,* 553 F.Supp. 976 (D.Hawaii 1983); *cf. Charley's Taxi Radio Dispatch Corp. v. Sida of Hawaii, Inc.,* 562 F.Supp. 712 (D.Hawaii 1983) (discussing 9th Circuit precedent).

 Here, there is no doubt that the fourth cause of action is directed against officers of the State of New York, seeking to enjoin them from enforcing the State's Penal Law. Plaintiffs say as much in their memorandum of law. (Plaintiffs' memorandum in support of the motion to certify classes and for summary judgment, and in opposition to the motions to dismiss the complaint by defendants, Dillon, Henry and Newsday at 44, hereinafter "Pl. Memo"). Moreover, while the state is not a named

party, plaintiffs' words leave little doubt that the state is the real party in interest in this cause of action: "The State's determination to eliminate competition in the market for cable accessories is contrary to the regulations scheme of the FCC."; "[T]he state's action in enacting the challenged amendments to Penal Law Section 165.15, Subdivision 4 is invalid ...." (*Id.* at 43). This cause of action being directed against the state and its officers, challenging under the antitrust laws the enactment and enforcement of section 165.15(4), the question is whether the State of New York enacted Penal Law 165.15(4) in its sovereign capacity? To this question the answer is yes.

The evidence shows that faced with a growing problem of theft of cable television services, the State of New York, as sovereign, enacted legislation to combat the problem. While, as the commentary to Section 165.15(4) points out, "[a]voiding cable television charges is widely viewed in the same light as creative income tax calculations," N.Y.Penal Law § 165.15(4), commentary at 88 (McKinney Supp.1983), the legislation serves to advance the development of the cable television industry, a state concern, N.Y.Exec.Law § 811 *et seq.* and, on its face, benefits the public by stemming the widespread theft of services that must inevitably be to the detriment of legitimate subscribers. *Id., National Subscription Television v. S & H TV*, 644 F.2d 820, 826 (9th Cir.1981); *American Television and Communications Corp. v. Western Techtronics, Inc.,* 529 F.Supp. 617, 621–22 (D.Colo.1982). In addition, our previous discussion shows that other state and local interests are served as well. *See* pp. 151–52 *supra. A fortiori,* we find no merit to the argument that 165.15(4) serves no legitimate state interest and instead authorizes defendants to violate the antitrust laws by declaring their action lawful. Thus, we conclude that the state action exemption applies to this cause of action.

Furthermore, on this issue we attribute no great significance to the fact that several of the cable companies now allow a subscriber to use and hook up to their system their own descrambler or decoder.

Suffice to say, the companies allow it if the subscriber agrees to pay for all services he or she receives. Of course, far better for the companies to allow persons who have such equipment in their hands, and who disclose this fact, to use it and pay for the services they receive, than to adopt a policy which could only serve to compound theft of services by offering subscribers the alternatives of discarding this quite expensive equipment or violating the penal law by using it in an unlawful manner. However viewed, this fact in no way detracts from the justification for or legitimacy of the passage of the recent amendment to Penal Law section 165.15, or bears on the applicability of the state action doctrine.

Having rejected plaintiffs' claims that N.Y.Penal Law section 165.15(4) serves no legitimate state interest and that the State of New York has failed to supervise the market for the sale of cable accessories on the above stated grounds, we add the following. While plaintiffs' papers in broad language complain of the state's failure to supervise the market for cable accessories, the clear subject of their fourth cause of action is the statute prohibiting the *sale of decoders and descramblers.* Plaintiffs complain of this provision and seek injunctive relief so that they may sell decoders and descramblers presumably to the public-at-large or on a wholesale basis to retailers. *See,* Plaintiffs' Memo in Support of the Motion to Dismiss Various Defenses of the Cable Companies at 6 ("What plaintiff seeks to do is provide cable subscribers with the opportunity to purchase and own such equipment....") Under this view and even assuming *arguendo* the applicability of the *Midcal* test, the active supervision requirement is satisfied by the self-executing statute. The statute leaves no market for the sale of decoders and descramblers to anyone other than a telecommunications provider for use in the provision of its own services. Thus, there is nothing left for the state to supervise. The initial enactment of present subdivision (4) of Penal Law section 165.15 is a legislative decision that itself satisfies the supervision require-

**158**

ment. 2 Areeda & Turner, *Antitrust Law*, par. 213(d) at 76–77 (1978).

 Addressing plaintiffs' argument that the FCC has pre-empted rate regulation of the cable industry and, therefore, that the "State's determination to eliminate competition in the market for cable accessories is contrary to the regulatory scheme of the FCC," Pl. Memo. at 43, we find that the FCC has not preempted the states from enacting legislation to deter the theft of cable television services.

 We again note that at oral argument and in their various memoranda of law, plaintiffs have admittedly abandoned their claims that 165.15(4) deprives them of equal protection or due process of the law, deprives them of their civil rights, or violates the Commerce Clause. In any event, we would find no merit in these claims, and note that at least fifteen other states expressly prohibit the sale or offer for sale of devices enabling the unauthorized reception of cable television signals, e.g., Ariz. Rev.Stat.Ann. § 13–3709 (West Supp.1983); Cal.Penal Code §§ 593d, 593e (West Supp. 1983); Ga.Code §§ 46–5–2, 46–5–3 (1982); Hawaii Rev.Stat. § 275–9 (Supp.1982); Ill. Ann.Stat. ch. 38, § 16–10 (Smith-Hurd Supp.1983); 1983 La.Acts No. 471; Mass. Gen.Laws Ann. ch. 166, §§ 42A, B (West 1976), as amended by 1983 Mass.Acts ch. 98; Mich.Comp.Laws Ann. § 750.540c (West Supp.1983); N.H.Rev.Stat.Ann. § 638:5–a (Supp.1981); 1983 N.J.Sess.Law Serv. ch. 15 (West); N.C.Gen.Stat. § 14–118.5 (Michie/Law Coop 1981); Ohio Rev. Code Ann. § 4933.42 (Page Supp.1982); 1983 Okla.Sess.Laws ch. 381; 1983 R.I. Pub.Laws, ch. 316; Va.Code § 18.2–165.1 (1982); and that the great majority of states prohibit the theft of cable television or telecommunications services. Finally, we consider no claims against the statute's validity not raised by plaintiff, or which plaintiff is without standing to raise.

### CONCLUSION

Accordingly, since there are no material issues of fact, defendants' motion for summary judgment dismissing plaintiffs' fourth cause of action is granted. Since the complaint attempts to plead no claim against defendants Dillon and Henry except insofar as stated in the fourth cause of action, the motions of Dillon and Henry to dismiss are also granted.

The remaining motions will be addressed by the Court consistent with the parties' proposed briefing schedules, and the prior direction of this Court.

SO ORDERED.