[Civ. No. 1424.  Second Appellate District.—January 9, 1914.]

# W. H. ROBINSON et al., Respondents, v. JAMES B. BLEDSOE, Appellant.

TENANCY IN COMMON—ACQUISITION OF ADVERSE TITLE—TENANT AS TRUSTEE.—As a general rule a tenant in common, occupying, as he is presumed to, relations of trust and confidence toward his co-tenants, may not acquire an adverse title to that under which possession of the property is held, without being charged as a trustee in the holding thereof for the joint benefit of the cotenancy; but the relation of cotenants is not necessarily so intimate as to preclude one of them from acquiring and asserting an adverse claim against the others.

ID.—EXISTENCE OF TENANCY IN COMMON—COLOR OF TITLE AND ASSERTION OF CLAIM.—In order that a tenancy in common may exist between parties in the holding of land, it is necessary that they possess some color of title and assert their claim in some tangible way.

ID.—STATE LAND—POSSESSORY RIGHT—CHARACTER OF POSSESSION.—Under section 1006 of the Civil Code, a possessory right to state lands may be acquired which will be sufficient against all except the sovereignty. But this right must be evidenced by actual possession, for there can be no constructive possession in such a case.

ID.—ACTUAL POSSESSION—WHAT CONSTITUTES—NOTICE OF CLAIM.—By actual possession is meant a subjection to the will and dominion of the claimant. It is usually evidenced by occupation, by a substantial inclosure, by cultivation, or by appropriate use, according to the particular locality and quality of the property. The acts and things done must be of such a nature as to give notice to the public of the claim.

ID.—DESERT LAND USED BY CATTLEMEN—TITLE ACQUIRED BY ONE NOT HELD IN TRUST FOR OTHERS.—Where, after a number of cattlemen have for years used a large tract of desert land for grazing, one of their number purchases a part of the land from the state, the others who have never asserted, or attempted in any way to give notice, that they claimed the right to the possession of any particular lands, except thirty acres thereof, cannot maintain an action to have it declared that the purchaser holds the land in trust for them as tenants in common.

ID.—EXCLUSION OF COTENANT—RIGHT TO CONSIDER TENANCY AT END.—If the plaintiffs in such action fenced thirty acres of the tract, and excluded the defendant therefrom because of his refusal to pay his

proportion of the cost of the fence, this entitled him to treat the assumed cotenancy, if any existed as to that ground, as at an end.

ID.—IMPROVEMENTS—FAILURE OF COTENANT TO MAKE CONTRIBUTION—SUMMARY REMEDY AGAINST HIM.—There is no right in cotenants, who make improvements on the common property, to seize the property of a noncontributing member and so summarily work out their remedy for his failure to contribute to the cost of improvements made with his consent.

ID.—POSSESSION OF COMMON PROPERTY—EQUAL RIGHTS OF COTENANTS.—To constitute a tenancy in common there must be an equal right to the possession of every part and parcel of the subject matter of the tenancy.

APPEAL from a judgment of the Superior Court of San Bernardino County and from an order refusing a new trial. Frank F. Oster, Judge.

The facts are stated in the opinion of the court.

R. E. Bledsoe, Leonard & Surr, and George W. Hellyer, for Appellant.

Byron Waters, for Respondents.

JAMES, J.—Action to have title to certain land, which was secured by purchase from the state, declared to be held in trust for the benefit of plaintiffs as tenants in common with defendant. Plaintiffs had judgment. Defendant's motion for a new trial was denied, and he appealed from that order and from the judgment.

By the testimony shown in the bill of exceptions it appears that in the county of Kern, near the border line of San Bernardino County, there is an extensive stretch of arid land which is commonly called the "Mojave River country." This land has been used by various cattle owners for from twenty to forty years, and perhaps longer, as a grazing ground. It has been so used generally with no permission from the owner, except that which is inferable from the fact that no objection has been raised against such use. This ground has no water except by the rain that falls during the winter months. At places, however, which are usually situated many miles apart, water in small quantities comes to the surface of the ground in the form of springs, and at these places the cattle which graze

over the common range drink. About the watering places once or twice each year rodeos have been held. At these times the different cattle owners were given notice of the holding of the rodeo and they attended for the purpose of separating their cattle from the common herd. The calves were then branded and any unidentified or unclaimed animals, called "mavericks," were turned over to the cattle man who had the rodeo in charge, as his perquisites. Customarily some of the cattle raisers would erect inclosures and frame structures at these watering places and in that case they, by consent of their fellows, were deemed to be in authority at the round-ups. In general, between the times when the round-ups were held, none of the cattle men resided at the watering places, but lived elsewhere, and no ownership in the land over which the cattle grazed appears to have been asserted by the owners of the herds.

For many years prior to 1893 one Durnal had grazed his cattle over that desert range. He made his headquarters at Flowing Wells, which was the name of a watering place and not a town. At this place, scattered over about two acres of ground, were eight or nine springs of water. In order to make the water better available for supplying the cattle, a square wooden pipe of about four by four inches in dimensions was made by nailing four boards together. One length of this pipe was thrust down into the spring and by that means the water was raised above the surface of the ground and conducted into a trough. Durnal built a rough lumber barn with a shake roof, also a small cabin, about a mile from the wells, and at another point several miles distant he had a stock corral, a second cabin, and a pump. His place of residence was at Tehachapi. In the year mentioned, one Downey, on behalf of himself, W. E. Boren, plaintiff W. H. Robinson, and the defendant Bledsoe, purchased from Durnal for the sum of one hundred and fifty dollars all of the improvements which he had placed at Flowing Wells, and also similar property at other points. Each of the persons mentioned were cattle raisers who resided along the Mojave River many miles away. From thence on the four men used Flowing Wells for rodeo purposes. They shared together the use of the improvements, but they had no joint interest in cattle, as each man severally owned and managed his herd. They

23 Cal. App.—44

moved the barn and cabin just mentioned to a point close to the springs. In 1905, Boren and Downey sold their cattle to plaintiff Bennette, and at the same time sold their interest in the various improvements used by them on the desert, including the Flowing Wells property. Plaintiff Bennette and defendant Bledsoe were not on friendly terms because of some ancient grudge existing between them, and from the time that the former bought the cattle and interests of Boren and Downey, when the two men met at the rodeos there was no interchange of friendly converse. Each ignored the presence of the other. In 1906 Robinson proposed to the defendant that a fence be built at Flowing Wells for the purpose of forming an inclosure within which cattle might be kept when desired. Defendant stated that he would be unable to assist in the building of the fence, but would pay his proportion of the cost, if one was built by the other two men. Robinson hired some men, and they, with Bennette and a son of Robinson, put up a pasture fence inclosing about thirty acres. Robinson presented a bill to defendant for the amount which he claimed to be the proportion of the cost of building the fence chargeable to defendant. Bledsoe refused to pay this bill on the ground that the amount charged for labor was excessive, and the account remained unsettled. Because of Bledsoe's refusal to discharge this alleged indebtedness plaintiffs refused to allow him to use the pasture, making their permission for such use conditional upon the payment of the account. The trial court found these facts as to the building of the corral and the exclusion of defendant from the use of it. It appears that none of the defendants knew to whom the land belonged which they were grazing their cattle over and upon which the Flowing Wells springs were located; they made no claim to the ownership of it. The witness Downey, the predecessor in interest of Bennette, testifying for the plaintiffs said: "I never claimed any title to that land. I rather thought that I had a right to water my cattle there. Everybody else had the same right; they enjoyed the same right. I did not claim the right to enjoy the exclusive use of that water. . . . I have seen as many as twenty men on the ground there, different owners and their helpers; they would all in common, and in connection with myself, Bledsoe, Robinson, and Boren, use the place as a round-up place, and for cattle purposes—

drinking. . . . When I stated a moment ago that we all used them in common, I referred to the water and corral.'' These statements of the witness describe correctly the general condition as to the rights assumed by the cattle owners on that range. In 1908, defendant caused surveys to be run about some two hundred and eighty acres of land, including that upon which Flowing Wells springs were located. He learned that the land was a part of the school lands of the state of California, and thereupon he made application to purchase the two hundred and eighty acres. His application was approved and in November, 1908, he received his certificate of purchase. He next gave notice of his ownership to the plaintiffs, and this notice required that if they (the plaintiffs) desired to continue the use of the wells, they must arrange for such use by lease. In this notice he offered to pay any sums that might be reasonable for plaintiffs' share in the improvements. Plaintiffs refused to lease from defendant, and shortly thereafter brought this suit.

The correctness of the proposition, as a general rule, that a tenant in common, occupying as he is presumed to, relations of trust and confidence toward his cotenants, may not acquire an adverse title to that under which possession of the property is held, without being charged as a trustee in the holding thereof for the joint benefit of the cotenancy, is not disputed. There are two principal questions presented by this appeal, to wit: 1. Whether the relation of cotenants existed between plaintiffs and defendant in their possession of the land which defendant purchased. 2. Assuming that such relation did exist, whether under the circumstances shown in evidence defendant was relieved from his trust obligations so as to permit him to make purchase of title and enforce it to the exclusion of the plaintiffs. In order that a tenancy in common should have existed between plaintiffs and defendant in the holding of the lands, it was necessary that the parties should have possessed some color of title and asserted their claim in some tangible way. Under the Civil Code, section 1006, a possessory right to state lands may be acquired which will be sufficient against all except the sovereignty. This possessory right must be evidenced by actual possession; for there could be no constructive possession in such a case. ''By actual possession is meant a subjection to the will and dominion of the claimant,

and is usually evidenced by occupation, by a substantial inclosure, by cultivation, or by appropriate use, according to the particular locality and quality of the property.'' (*Coryell* v. *Cain,* 16 Cal. 567.) The acts and things done must be of such a nature as to give notice to the public of the claim. (*Brumagim* v. *Bradshaw,* 39 Cal. 24.) Applying the requirements of these rules to the evidence here shown, it will be seen, first, that the alleged cotenants never asserted, or attempted in any way to give notice, that they claimed the right to the possession of any particular lands, except as to the thirty-acre pasture, which two of them fenced and which will be referred to in a later portion of this opinion. It is well to point out here that the question as to whether any of the cattle owners, by continued use of the water which came to the surface of the ground at the different oases, acquired easement rights therein which could not be destroyed upon transfer of the fee in the land, is not involved. This action concerns the land alone. As has been noted, there had been no claim made by the alleged cotenants that they were entitled to the possession of any certain land. The range extended for many miles and nothing short of the line of the horizon seems to have marked a limit to the wandering of the herds. If defendant had been permitted, for instance, to purchase a complete section of land, would his cotenants have claimed the right to share in that purchase? They might as reasonably have done so, for they declare in their complaint that the two hundred and eighty acres purchased included the lands upon which the springs were located, *and other lands as well.* They marked out no boundary to lands necessary to the convenient use of the water, which was the one inducement, as all agree, that brought them and their cattle there. There was some testimony that cattle men respected range limits as between each other, but that appears to have been a mere matter of private understanding and of which no sort of notice was given. There was no tenancy in common of specific land either described in the complaint or illustrated by the evidence.

Coming now to the thirty-acre plat which was fenced by plaintiffs: This pasture was used by plaintiffs, and the court found that they had excluded defendant from its use, making such refusal conditional upon defendant paying a proportion of the cost of the construction of the fence. Plaintiffs cannot

maintain that as to the pasture a cotenancy existed, while admitting, as the court found, that they denied the defendant, one of the alleged cotenants, the use of it. ''Neither cotenant has any power to compel the others to unite with him in erecting buildings or in making any other improvements upon the common property. . . . If a cotenant has assented to or authorized improvements to be made, he is answerable therefor, and a lien exists against his property for the amount thereof against him and his grantees with notice.'' (Freeman on Cotenancy, 2d ed., par. 262.) There is no right in cotenants to seize the property of the noncontributing member and so summarily work out their remedy for his failure to contribute to the cost of improvements made with the latter's consent. ''To constitute a tenancy in common there must be an equal right to the possession of every part and parcel of the subject matter of the tenancy,'' observes Mr. Freeman in the work to which citation has been made; and at paragraph 155 he states: ''As the rule forbidding the acquisition of adverse titles by a cotenant, from being asserted against his companions, is always said to be based upon considerations of mutual trust and confidence supposed to be existing between the parties, the question naturally arises whether the rule is applicable where the reasons on which it is based are absent. Joint-tenants, tenants by entirety, and coparceners, always hold by and under the same title. Their union of interest and of title is so complete, that, beyond all doubt, such a relation of trust and confidence unavoidably results therefrom that neither will be permitted to act in hostility to the interests of the other in reference to the joint estate. Tenants in common, on the other hand, may claim under separate conveyances, and through different grantors. . . . As their connection is not necessarily so intimate as that of other cotenants, it may well be doubted whether they should always be subject to the restraints imposed upon the others. There are many cases in which the rule in regard to the acquisition of an adverse title by a cotenant is spoken of in general terms as applying to tenants in common, irrespective of their special and actual relations to one another. But an examination of the decisions clearly shows that tenants in common are not necessarily prohibited from asserting an adverse title.'' The refusal to allow defendant to share in the use of the pasture

entitled him to treat the assumed cotenancy, if any existed as to that ground, as at an end. If this result did not follow, certainly the relations shown to have existed between the parties were such as to negative the presumption of mutual trust and confidence.

These conclusions, which affect the main propositions involved in this appeal, require that the judgment and order should be reversed as not being sustained by the evidence.

The judgment and order are reversed.

Conrey, P. J., and Shaw, J., concurred.