[Civ. No. 20883. Third Dist. June 21, 1985.]

CALIFORNIA SATELLITE SYSTEMS, INC.,
Plaintiff and Respondent, v.
RALPH NICHOLS et al., Defendants and Appellants.

58

**COUNSEL**

Jed Scully, Douglas H. Drake, Walter R. Hyatt, Glendalee Scully and Joan Clark for Defendants and Appellants.

de la Vergne & Murtry, James V. de la Vergne, Donna L. Freeman, Weintraub, Genshlea, Hardy, Erich & Brown and Roger T. Stewart for Plaintiff and Respondent.

**OPINION**

**PUGLIA, P. J.**—Defendants Ralph Nichols, Adolph Gower, and Douglas Hyatt appeal from a preliminary injunction granted upon essentially undisputed facts. The principal issue posed is whether a state court may entertain a private action brought under the federal Communications Act (47 U.S.C.A. § 151 et seq. at § 605) to enjoin the unauthorized interception and use of microwave transmissions of television signals intended by the distributor for the exclusive use of its paying subscribers. As appears, we conclude that it may. ■■ ■■ ■■ We also reject defendants' remaining contentions and affirm the issuance of the preliminary injunction based on probable violations of 47 United States Code Annotated § 605.[1]

Plaintiff California Satellite Systems distributes Home Box Office (HBO) television programs uninterrupted by commercial messages and consisting

---

[1] In his closing brief, defendant Nichols challenges the sufficiency of the evidence, arguing for the first time that the trial court erroneously found defendants introduced no evidence controverting plaintiff's "facts." Since Nichols provides no reason for failure to raise the point in a timely manner, we are not obligated to consider it further. (*Utemark* v. *Samuel* (1953) 118 Cal.App.2d 313, 318 [257 P.2d 656]; see also generally 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 442, pp. 4405-4406.) In any event, Nichols' claim rests on a statement in the trial court's announcement of tentative decision (Cal. Rules of Court, rule 232) to the effect that, although the court had allowed extensive oral testimony, defendants did not "appear" to have introduced any declarations or other evidence placing plaintiff's facts in issue. A tentative decision does not constitute a judgment and is not binding on the trial court. (Cal. Rules of Court, rule 232(a).) Furthermore, neither the conclusions nor the reasoning embodied in a trial court's opinion furnish any basis for an attack on otherwise unassailable findings and judgment. (See 6 Witkin, Cal. Procedure, *supra*, Appeal, § 230, pp. 4220-4221.)

primarily of movies and sports events to approximately 20,000 paying subscribers in the Sacramento area. The HBO programs originate in New York and are transmitted via satellite to an "earth station" east of Sacramento. The programs are then relayed to a microwave receiving station in Carmichael, near Sacramento, where they are transmitted by omnidirectional signal to multiple points in the Sacramento area. Microband Corporation holds a license as a "common carrier" to operate the Carmichael transmitting station as a multipoint distribution service (MDS) under Federal Communications Commission regulations. The frequencies assigned to it are 2154.75 megahertz for visual and 2150.25 megahertz for aural transmissions.

The MDS microwave signal is transmitted at such high frequency it is incapable of being received by conventional television receivers. Additional equipment is necessary for home viewing of HBO programs. This equipment consists of a specially designed microwave antenna directed at the Carmichael station to receive the signal, a "down converter" to translate the microwave signal into a lower frequency transmitted by ordinary television channels, and a power supply to convert ordinary household voltage into voltage usable by the down converter.

By contractual arrangements, plaintiff pays HBO for the exclusive license to distribute HBO programming in the area and pays Microband for the operation of its MDS system. Plaintiff in turn charges its HBO subscribers a monthly service fee, plus an initial charge for supplying and installing a specially designed directional microwave antenna, a down converter, and a power supply for the converter.

In support of its motion for a preliminary injunction, plaintiff produced evidence strongly suggesting that defendants manufacture, sell, and install microwave antennae, down converters, and power supplies locally for the understood purpose of enabling Sacramento-area residents to receive HBO television programs without paying the fee plaintiff charges its subscribers. While alleging severe economic distress as a result of the "pirating" of its signal, plaintiff presented no specific evidence of immediate financial difficulty. Plaintiff has, however, invested substantial sums to enable it to provide exclusive HBO programming to its subscribers. These sums include the costs of purchasing and servicing antennae and other special equipment, programming license fees and common carrier fees.

The trial court concluded a reasonable probability existed plaintiff would prevail in establishing that defendants were violating 47 United States Code

Annotated § 605 (hereafter § 605).[2] Because the equipment that defendants and other entrepreneurs sold in the interim would exist in households for years to come, the court also found plaintiff would suffer irreparable injury if a preliminary injunction were denied. After further balancing the equities between the parties, the court issued a preliminary injunction restraining defendants during the pendency of the action from selling or distributing any directional antenna, down converter, or power supply with the intent, understanding, or knowledge that such equipment "will or may be used" by residents in the Sacramento area to intercept and receive plaintiff's programs sent by microwave signal from the MDS station located in Carmichael.

I

On appeal from an order issuing a preliminary injunction, we are guided in our consideration of defendants' contentions by the principles expounded in *Continental Baking Co.* v. *Katz* (1968) 68 Cal.2d 512 [67 Cal.Rptr. 761, 439 P.2d 889]: " 'The authorities are numerous and uniform to the effect that the granting or denial of a preliminary injunction on a verified complaint, together with oral testimony or affidavits, even though the evidence with respect to the absolute right therefor may be conflicting, rests in the sound discretion of the trial court, and that the order may not be interfered with on appeal, except for an abuse of discretion.' . . . [¶] 'The granting or denial of a preliminary injunction does not amount to an

---

[2]At the time the preliminary injunction issued, § 605 provided in full: "Except as authorized by chapter 119, Title 18, no person receiving, assisting in receiving, transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception, (1) to any person other than the addressee, his agent, or attorney, (2) to a person employed or authorized to forward such communication to its destination, (3) to proper accounting or distributing officers of the various communicating centers over which the communication may be passed, (4) to the master of a ship under whom he is serving, (5) in response to a subpena issued by a court of competent jurisdiction, or (6) on demand of other lawful authority. No person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect or meaning of such intercepted communication to any person. *No person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto.* No person having received any intercepted radio communication or having become acquainted with the contents, substance, purport, effect or meaning of such communication (or any part thereof) knowing that such communication was intercepted, shall divulge or publish the existence, contents, substance, purport, effect, or meaning of such communication (or any part thereof) or use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto. *This section shall not apply to the receiving, divulging, publishing, or utilizing the contents of any radio communication which is broadcast or transmitted by amateurs or others for the use of the general public, or which relates to ships in distress.*" (As amended June 19, 1968, Pub.L. No. 90-351, § 803, 82 Stat. 223; italics added.)

adjudication of the ultimate rights in controversy. It merely determines that the court, balancing the respective equities of the parties, concludes that, pending a trial on the merits, the defendant should or that he should not be restrained from exercising the right claimed by him.' [Citations.] The general purpose of such an injunction is the preservation of the status quo until a final determination of the merits of the action. [Citations.] Thus, the court examines all of the material before it in order to consider 'whether a greater injury will result to the defendant from granting the injunction than to the plaintiff from refusing it; . . .' [Citations.] In making that determination the court will consider the probability of the plaintiff's ultimately prevailing in the case . . . . 'In the last analysis the trial court must determine which party is the more likely to be injured by the exercise of its discretion [citation] and it must then be exercised in favor of that party [citation].' " (68 Cal.2d at pp. 527, 528; see also *IT Corp.* v. *County of Imperial* (1983) 35 Cal.3d 63, 69-70 [196 Cal.Rptr. 715, 672 P.2d 121]; *National Subscription Television* v. *Formula International, Inc.* (1984) 153 Cal.App.3d 308, 314-315 [200 Cal.Rptr. 213]; *People* v. *Adult World Bookstore* (1980) 108 Cal.App.3d 404, 408 [166 Cal.Rptr. 519].)

II

Defendants initially contend that plaintiff's complaint sounds in copyright infringement, a subject over which a state court lacks jurisdiction because preempted by federal law (see 17 U.S.C.A. § 301). As we view it, however, the issue is not one of preemption but whether a state court has subject matter jurisdiction over private causes of action arising under § 605 (see fn. 2, *ante,* p. 63).

It is clear that the federal Copyright Act preempts legal and equitable causes of action brought "under the common law or statutes *of any State*" which are "equivalent to" any of the exclusive rights within the general scope of copyright. (17 U.S.C.A. § 301(a); see also 1 Nimmer on Copyright (1983 ed.) § 1.01[B], p. 1-6; *Orth-O-Vision, Inc.* v. *Home Box Office* (S.D.N.Y. 1979) 474 F.Supp. 672, 682-684.) By its terms, the preemptive effect of section 301(a) is limited to state law. (See Historical Note, 17 U.S.C.A. (1977 ed.) § 301, p. 271.) Nothing in federal copyright law "annuls or limits any rights or remedies under any other Federal Statute." (17 U.S.C.A. § 301(d), and Historical Note thereto in 17 U.S.C.A. (1977 ed.) § 301, p. 271; see also 1 Nimmer on Copyright, *supra,* 1.01[B][4], p. 1-28.) Here, the preliminary injunction issued on the basis of probable violation of a federal statute (§ 605). It is a non sequitur to argue that because state causes of action are preempted by federal copyright law, state courts lack subject matter jurisdiction to entertain a federal claim, even one sounding in copyright.

It is now established that a private right of action arises under § 605. (*Chartwell Communications Group* v. *Westbrook* (6th Cir. 1980) 637 F.2d 459, 466 [61 A.L.R. Fed 797]; *National Subscription Television* v. *S & H TV* (9th Cir. 1981) 644 F.2d 820, 821, fn. 1.) Unless Congress has conferred exclusive jurisdiction on federal courts, state courts have concurrent jurisdiction to adjudicate the federally created cause of action. (See *Brown* v. *Pitchess* (1975) 13 Cal.3d 518, 521 [119 Cal.Rptr. 204, 531 P.2d 772]; *Williams* v. *Horvath* (1976) 16 Cal.3d 834, 837 [129 Cal.Rptr. 453, 548 P.2d 1125].)

■ The general rule is that state courts have concurrent jurisdiction to enforce rights and obligations arising under a federal statute absent an express or implied "provision by Congress to the contrary or disabling incompatibility between the federal claim and state-court adjudication." (*Gulf Offshore Co.* v. *Mobile Oil Corp.* (1981) 453 U.S. 473, 477-478 [69 L.Ed.2d 784, 791, 101 S.Ct. 2870]; see also generally 1 Witkin, Cal. Procedure (2d ed. 1970) Jurisdiction, § 57, p. 580.) A presumption lies that state courts enjoy concurrent jurisdiction unless it is "rebutted by an explicit statutory directive, by unmistakable implication from legislative history, or by a clear incompatibility between state-court jurisdiction and federal interests." (*Gulf Offshore Co., supra,* 453 U.S. at p. 478 [69 L.Ed.2d at p. 791].)

■ We find nothing in the language, legislative history, or underlying policies of the federal Communications Act (Act) to suggest any incompatibility or conflict between federal and state court adjudication of private rights of action arising under § 605. (See *Gulf Offshore Co., supra,* 453 U.S. at pp. 478-484 [69 L.Ed.2d at pp. 792-795]; *TV Pix, Inc.* v. *Taylor* (D.Nev. 1968) 304 F.Supp. 459, 465, affd. (1970) 396 U.S. 556 [24 L.Ed.2d 746, 90 S.Ct. 749].) To the contrary, since its inception the Act has provided that nothing in its procedural and administrative provisions ". . . shall in any way abridge or alter the remedies now existing at common law or by statute, . . ." (47 U.S.C.A. § 414; see also *TV Pix, supra,* 304 F.Supp. at p. 464; *Head* v. *Board of Examiners* (1963) 374 U.S. 424, 431 [10 L.Ed.2d 983, 989, 83 S.Ct. 1759].)

Finally, the Act was amended in 1984 after the preliminary injunction issued expressly to provide that any aggrieved person ". . . may bring a civil action in a United States district court *or in any other court of competent jurisdiction . . .*" (subd. (d)(3)(A); italics added) and that the court may ". . . grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain violations . . ." of the section (subd. (d)(3)(B)(i)). (Pub.L. No. 98-549 (Oct. 30, 1984) § 5(a), 98 Stat. 2802.) While the amendment does not relate back to the original exercise of trial court jurisdiction in this case (Pub.L. No. 98-549, *supra,* § 5(b)), the leg-

islative history makes clear that Congress ". . . intended to leave undisturbed the case law that has developed confirming the broad reach of section 605 as a deterrent against privacy of protected communications. . . ." (1984 U.S. Code Cong. & Admin. News, at p. 4746.) What the 1984 amendment accomplished was to retain the language of existing § 605, to strengthen the "penalties" for the unauthorized reception of communications protected by § 605, and to delineate a very narrow exception to liability limited to the interception of "unencrypted or unaltered satellite cable programming." (*Id.,* at pp. 4746, 4747, 4750-4751.)

We conclude that the superior court had jurisdiction over plaintiff's action to enforce the federal right created by § 605. (See *Gulf Offshore Co., supra,* 453 U.S. at p. 478, fn. 4 [69 L.Ed.2d at p. 791].) The existence of concurrent jurisdiction in the courts of this state " 'creates the duty to exercise it.' " (*Brown* v. *Pitchess, supra,* 13 Cal.3d at p. 523; cf. *Martinez* v. *California* (1980) 444 U.S. 277, 283, fn. 7 [62 L.Ed.2d 481, 488, 100 S.Ct. 553]; *Maine* v. *Thiboutot* (1980) 448 U.S. 1, 3, fn. 1 [65 L.Ed.2d 555, 558, fn. 1, 100 S.Ct. 2502].)

### III

■ Since relief by injunction operates in futuro, the right to such relief must be determined under the law which exists at the time of an appellate court's decision. (*White* v. *Davis* (1975) 13 Cal.3d 757, 773, fn. 8 [120 Cal.Rptr. 94, 533 P.2d 222]; *Cal-Dak Co.* v. *Sav-On Drugs, Inc.* (1953) 40 Cal.2d 492, 496-497 [254 P.2d 497]; *United States* v. *Alabama* (1960) 362 U.S. 602, 604 [4 L.Ed.2d 982, 983, 80 S.Ct. 924]; 6 Witkin, Cal. Procedure, *supra,* Appeal, § 222, p. 4212.)

As amended in 1984, § 605(a) continues to forbid an unauthorized individual to "receive or assist in receiving any interstate or foreign communication by radio and use such communication . . . for his own benefit or for the benefit of another not entitled thereto." (Pub.L. No. 98-549, *supra,* § 51(a).) By a 1982 amendment, the last sentence of subsection (a) exempts from the protection of the statute radio communications which are "transmitted by any station for the use of the general public. . . ." (Pub.L. No. 97-259, § 126, 96 Stat. 1099; cf. emphasized language of former statute at fn. 2, *ante,* p. 63.)

The 1984 amendment to § 605 added a new subsection (b) which outlines an additional exception: "The provisions of subsection (a) of this section shall not apply to the interception or receipt by any individual, or the assisting (including the manufacture or sale) of such interception or receipt, of any satellite cable programming for private viewing if— [¶] (1) the pro-

gramming involved is not encrypted; and [¶] (2)(A) a marketing system is not established under which— [¶] (i) an agent or agents have been lawfully designated for the purpose of authorizing private viewing by individuals, and [¶] (ii) such authorization is available to the individual involved from the appropriate agent or agents; or [¶] (B) a marketing system described in subparagraph (A) is established and the individuals receiving such programming has [*sic*] obtained authorization for private viewing under that system." As defined in new subsection (c), "[T]he term 'satellite cable programming' means video programming which is transmitted via satellite and which is primarily intended for the direct receipt by cable operators for their retransmission to cable subscribers; . . ." (Subd. (c)(1).) "[T]he term 'encrypt', when used with respect to satellite cable programming, means to transmit such programming in a form whereby the aural and visual characteristics (or both) are modified or altered for the purpose of preventing the unauthorized receipt of such programming by persons without authorized equipment which is designed to eliminate the effects of such modification or alteration; . . ." (Subd. (c)(3).)

■ Contrary to a line of federal court decisions, defendants contend that the conduct attributed to them is not actionable under § 605. Their argument evaporates in light of the legislative history accompanying the 1984 amendment to § 605. As reported by committee, Congress ". . . intended to leave undisturbed the case law that has developed confirming the broad reach of section 605 as a deterrent against piracy of protected communications. Over the years federal courts, consistent with congressional intent, have recognized that section 605 provided broad protection against the unauthorized interception of various forms of radio communications. . . . [¶] Section 605 not only prohibits unauthorized interception of traditional radio communications, but also communications transmitted by means of new technologies. For example, *existing section 605 provides protection against the unauthorized reception of* subscription television (STV), *multipoint distribution services (MDS),* and satellite communications. This amendment . . . is intended to preserve this broad reach of existing section 605 and to make clear that all communications covered under section 605 will continue to be protected . . . . [¶] Moreover, existing section 605 is not limited to holding liable only those who, without authorization, actually receive a particular communication. Those who 'assist' (including sellers and manufacturers) in receiving such communications are similarily [*sic*] liable under section 605, and it is intended that this liability also remain undisturbed by this amendment." (1984 U.S. Code Cong. & Admin. News, at p. 4746; italics added.)

As defendants contend, the conduct proscribed by § 605 requires both an interception and either a divulgence or use. By knowingly manufacturing, selling, or installing microwave antennae, down converters, and power sup-

plies to facilitate unauthorized viewing of plaintiff's programs transmitted by MDS, defendants "'are assisting third parties in receiving communications to which they are not entitled.'" (*National Subscription Television* v. *S & H TV, supra,* 644 F.2d at pp. 826-827; *Chartwell Communications Group* v. *Westbrook, supra,* 637 F.2d at p. 466.) The viewing of an HBO program on a specially equipped television receiver constitutes both a receiving and a use of plaintiff's communications within the meaning of § 605 by nonsubscribers not entitled thereto. (*Ibid.*) Indeed, subsection (d)(4) of § 605 as amended in 1984 now specifies that: "The importation, manufacture, sale, or distribution of equipment by any person with the intent of its use to assist in any activity prohibited by subsection (a) of this section shall be subject to penalties and remedies under this subsection to the same extent and in the same manner as a person who has engaged in such prohibited activity." There is no contention here that the persons to whom defendants have provided special equipment do not use it to view HBO programming or that defendants were unaware of such use. (See *National Subscription Television, supra,* at p. 827.)

Nor are the MDS transmissions from the Carmichael station excluded from the protection of the statute, either by the "general public" exception of subsection (a) or the narrow exceptions of subsection (b). For § 605 purposes, the unauthorized interception of satellite cable programming "in its retransmitted form, where the form of transmission is otherwise protected under subsection (a) or other relevant law, is clearly prohibited. Thus, if the programming intercepted is transmitted, for instance, by means of the multipoint distribution service (MDS), or subscription television (STV), liability for such interception shall apply regardless of whether those controlling satellite cable programming have established a system under subsection (b)(2)." (1984 U.S. Code Cong. & Admin. News at pp. 4748-4749; see also *Movie Systems, Inc.* v. *Heller* (8th Cir. 1983) 710 F.2d 492, 495, fn. 7; *Hoosier Home Theater, Inc.* v. *Adkins* (S.D. Ind. 1984) 595 F.Supp. 389, 397-398; *American Television, Etc.* v. *Western Techtronics* (D.Colo. 1982) 529 F.Supp. 617, 620, fn. 4; FCC Public Notice No. 11850, Unauthorized Interception and Use of Multipoint Distribution Service (MDS) Transmissions (Jan. 24, 1979).)[3]

Defendants attempt to portray the programs distributed by plaintiff as transmitted for the use of the general public because, in addition to HBO, the programs transmitted from about 1:30 a.m. to midafternoon daily originate as a "commercial broadcast" from an Atlanta station (channel 17). At

---

[3]Necessarily, we reject defendants' related claim that plaintiff has failed to join Microband as an indispensible party to the suit, allegedly because plaintiff's only remedy lies against the MDS common carrier for failure to scramble its signal.

this preliminary stage of the lawsuit, suffice it to say that the pertinent inquiry is not the character of the programs at their point of origin but rather plaintiff's intent in distributing them in retransmitted form to Sacramento subscribers. Here, the evidence shows plaintiff pays Microband to transmit channel 17 from the MDS station in Carmichael from about 1:30 a.m. to 7:30 a.m. as part of the common carrier service for which Microband is licensed and pays Satellite Networks, licensed as a different type of communications common carrier, to receive both the HBO and channel 17 programs at the earth station east of Sacramento. Plaintiff in turn charges its subscribers a fee for providing them the channel 17 as well as HBO programs.

## IV

Defendants advance various affirmative defenses regarding issuance of the preliminary injunction. We address each briefly.

(7) A. Defendants contend that through issuance of the preliminary injunction plaintiff has been permitted privately to condemn the property of homeowners in the Sacramento area without just compensation in violation of the Fifth Amendment to the United States Constitution and article I, section 18, of the California Constitution. The short answer to this argument is that defendants have no standing to assert the rights of individual homeowners to place the special equipment on their property. (See Code Civ. Proc., § 367.) Moreover, the power of eminent domain for which "just compensation" is constitutionally compelled relates to a "taking" for a public use by governmental action, not private action. (See generally Nowak, et al., Constitutional Law (2d ed. 1983) § VII, pp. 480-485); 5 Witkin, Summary of Cal. Law (8th ed. 1974) Constitutional Law, § 529, pp. 3828-3829.)

B. Defendants attempt to shield their conduct under First Amendment freedom of speech. "However, the activity enjoined essentially proscribes conduct and only incidentally affects speech." (*National Subscription Television* v. *Formula International, Inc., supra,* 153 Cal.App.3d at p. 312.) The ". . . incidental effect does not trigger the kind of First Amendment analysis applied to legislation aimed at communication of information and ideas." (*Id.,* at p. 313; see also 1984 U.S. Code Cong. & Admin. News, at pp. 4668-4720.)

C. Defendants assert that the maintenance of plaintiff's action perpetrates an illegal tying arrangement under antitrust laws. Since the parties never focused on this issue at the evidentiary hearing on the preliminary injunction, and since the trial court made no specific factual findings on the sub-

ject, we deem it inappropriate at this time to consider the economic complexities of the antitrust claim. (See *Ciminelli* v. *Cablevision* (E.D.N.Y. 1984) 583 F.Supp. 144, 162; *Movie Systems, Inc.* v. *Heller, supra,* 710 F.2d at p. 496.)

◼ D. Defendants maintain the doctrine of unclean hands should bar plaintiff from obtaining equitable relief. **(9)** As a general rule, the application of the doctrine is primarily a question of fact and, in the context of a preliminary injunction, within the discretion of the trial court. (See *Insurance Co. of North America* v. *Liberty Mutual Ins. Co.* (1982) 128 Cal.App.3d 297, 306-307 [180 Cal.Rptr. 244]; *Boericke* v. *Weise* (1945) 68 Cal.App.2d 407, 418 [156 Cal.Rptr. 781].) The bar applies only if the inequitable conduct occurred in a transaction directly related to the matter before the court and affects the equitable relationship between the litigants. (*Pepper* v. *Superior Court* (1977) 76 Cal.App.3d 252, 259 [142 Cal.Rptr. 759]; *Fibreboard Paper Products Corp.* v. *East Bay Union of Machinists* (1964) 227 Cal.App.2d 675, 728-729 [39 Cal.Rptr. 64]; see also generally 7 Witkin, Summary of Cal. Law (8th ed. 1974) Equity, § 10, pp. 5235-5236.)[4]

◼ Viewing the record most favorably to the prevailing party as we must (*People* v. *Adult World Bookstore, supra,* 108 Cal.App.3d at p. 408), we discern no clear abuse of discretion in the trial court's rejection of the unclean hands defense. Defendants simply did not establish wrongful conduct on plaintiff's part sufficiently related to the subject of the action to justify the denial of relief. Imputations of unfairness as to plaintiff's relationship with Microband, its operation of an allegedly "unlicensed" transmitter in El Dorado Hills, and its allegedly "unlicensed" activity in servicing electronic equipment have no direct bearing on the equitable relationship between the parties. (See similarly *Germo Mfg. Co.* v. *McClellan* (1930) 107 Cal.App. 532, 541 [290 P. 534].) As to any unfairness among the parties associated with a monopoly status plaintiff may enjoy through a tying arrangement, we have already concluded that such antitrust claims are premature.

◼ E. Finally, defendants argue that the preliminary injunction is impermissibly overbroad and ambiguous because it prohibits defendants from selling directional microwave receiving equipment with the knowledge that the equipment "will or may be used" to intercept and receive plaintiff's programs. In particular, they contend that the phrase "may be used" can

---

[4]Our reliance on state rather than federal law in reviewing this equitable defense to the federal cause of action is of no moment since federal law is substantively the same. (See *Washington Capitols Basketball Club, Inc.* v. *Barry* (9th Cir. 1969) 419 F.2d 472, 478-479.)

be construed to mean either that the equipment is "capable" of being used to intercept plaintiff's programs *or* that the equipment might be used by the purchaser to intercept plaintiff's programs, either of which is overbroad.

 It is true that a preliminary "injunction must be definite enough to provide a standard of conduct for those whose activities are proscribed, as well as a standard for the ascertainment of violations of the injunctive order by the courts called upon to apply it." (*Pitchess* v. *Superior Court* (1969) 2 Cal.App.3d 644, 651 [83 Cal.Rptr. 35].) However, the injunction under scrutiny here does not forbid conduct in terms so vague that persons of common intelligence must guess at its meaning and application. (See *ibid.*)

We read the phrase "may be used" as intended to relate to the defendants' knowledge of the purchaser's intended use. Indeed, the close proximity of the word "may" to the phrase "will be used" more reasonably connotes an intended act rather than an intrinsic attribute of the equipment itself.

Confining the word "may" to the more restrictive meaning cures problems of overbreadth at this preliminary stage. To establish that defendants have in fact violated § 605, plaintiff may well have to prove that the equipment sold or otherwise supplied by defendants is actually used by purchasers to intercept plaintiff's programs. However, the standard for issuance of a preliminary injunction does not require plaintiff to prove a violation of the statute—merely the likelihood that plaintiff will so prove. Under this less stringent standard, an injunction restraining a sale of the specified equipment with the knowledge it may be used by the purchaser to intercept and receive plaintiff's programs is appropriately fashioned to meet the particular circumstances of the case. (See *California Retail Liquor Dealers Institute* v. *United Farm Workers* (1976) 57 Cal.App.3d 606, 610 [129 Cal.Rptr. 407].) Defendants are not required to "guess" the purposes of the purchaser at the time of sale; only a sale with the "knowledge" of the purchaser's unauthorized purpose is enjoined. Whether the purchaser will actually use the equipment for the understood purpose is all that is subject to debate.

## V

In the course of reviewing defendants' various contentions, we have concluded that a cause of action under § 605 exists in this state's courts to enjoin the alleged activities of defendants. We also have found no abuse of discretion in the trial court's determinations that a reasonable probability exists plaintiff will prevail in such an action and that, on balance, the equities between the parties support a preliminary injunction as issued by the court.

The order issuing the preliminary injunction is affirmed.

Sparks, J., and Bond, J.,* concurred.

A petition for a rehearing was denied July 16, 1985, and appellants' petition for review by the Supreme Court was denied September 12, 1985. Reynoso, J., was of the opinion that the petition should be granted.

*Assigned by the Chairperson of the Judicial Council.