[No. D014750. Fourth Dist., Div. One. June 29, 1993.]

JAN F. WILSON et al., Plaintiffs and Appellants, v.
S.L. REY, INC., et al., Defendants and Respondents.

**COUNSEL**

Ravin & Hakes, McDonald, Ravin & Luther, William W. Ravin and Audrey Powers Thornton for Plaintiffs and Appellants.

James Warren Beall for Defendants and Respondents.

## OPINION

**NARES, J.**—At the close of evidence in a bench trial, plaintiffs Jan F. Wilson and Redondo Investments, Inc. (Redondo), a Texas corporation wholly owned by Wilson's husband, George Cleland, moved for judgment on the pleadings. Defendants, S.L. Rey, Inc., San Ysidro Associates, III (SYA), and Juan Orendain moved for judgment under Code of Civil Procedure section 631.8. The trial court took the matter under submission with the parties' stipulation that the court's oral ruling would constitute a statement of decision.

The trial court, finding the plaintiffs (collectively, Wilson) had unclean hands, ruled in favor of defendants (collectively, Orendain) and in a subsequent order, denied Wilson's motion for relief from forfeiture and awarded costs and attorney fees to Orendain. Wilson amended the notice of appeal to include both the judgment and the order. Substantial evidence supports the trial court's finding of unclean hands. Accordingly, we affirm.

### FACTS AND PROCEDURE

In 1977, Frances Pikush, Edward Halprin and Jan F. Wilson purchased 156 acres of undeveloped land in Bonsall, as tenants in common.[1] Each party received an undivided one-third interest. Later, those shares were reapportioned because only Wilson had contributed to the down payment. Thus, Jan Wilson's interest increased to 44 percent, while Halprin and Pikush each maintained 28 percent interests.

The three cotenants took title in the property subject to existing encumbrances, in the form of three trust deeds. The second trust deed "wrapped around" the first trust deed and was known as the Shattuck note. The third trust deed secured obligations to several people, but was known as the Probst note.

SYA, a general partnership composed of Juan Orendain and Jose Rivas with 15 and 85 percent shares respectively, loaned money to Pikush. Pikush secured the SYA note with her 28 percent interest in the Bonsall property. Pikush defaulted on this note and SYA obtained her 28 percent interest on November 26, 1985, following a foreclosure sale.

After obtaining title, SYA discovered that both the Shattuck and Probst notes were in arrears; taxes were delinquent on the property dating back to

---

[1]At the same time the three cotenants entered into a "joint venture" agreement, that among other things provided each party with a right of first refusal should the other cotenants seek to sell their interest in the property.

1978; and an unrecorded lease for sand and gravel mining existed between Pikush and a stranger to the cotenancy (LaPaglia), whereby the cotenants received monthly royalties of 15 cents per yard.

Orendain, representing SYA, wrote Wilson and Halprin requesting the debts be paid and an accounting of profits on the mining lease. Wilson and Halprin refused to account.

Orendain, purportedly acting as an individual, purchased the Probst note, after Probst had threatened foreclosure. Wilson asserted the funds came from Rivas, but offered no supporting evidence.

Orendain recorded assignment of the Probst note on January 9, 1986. Orendain then had notice of default and election to sell recorded January 14, 1986.

Halprin filed chapter 11 bankruptcy on April 11, 1986. Orendain actively participated in the bankruptcy proceeding, spending $15,000 in attorney fees. The bankruptcy was dismissed on November 24, 1987; Orendain did not recover his fees.

Three days later, without consideration, Wilson conveyed 10 percent interest in the Bonsall property to her husband's recently formed corporation, Redondo. Neither Halprin nor SYA was informed or offered a right of first refusal in this transfer.

Meanwhile, in December 1987, SYA filed an unlawful detainer action against the sand and gravel miner, LaPaglia, for waste, breach of lease, and failure to account. Wilson refused to join in this action. Rather, unbeknownst to Orendain and without legal authority, Cleland locked LaPaglia out of the sand mining operation.

On December 17, 1987, Orendain recorded, published and served a notice of trustee's sale on the Probst note, scheduled for January 14, 1988.

On January 8, 1988, Wilson entered into a contract with Redondo, conferring sand and gravel mining rights in return for royalties at 50 cents per yard. This contract was executed without the knowledge or assent of Halprin or Orendain. The sand mining operation grossed over $1 million in 1988 and 1989, and over $2 million in 1990. Cleland testified the sand mining resulted in a net loss, though he offered no proof of any loss.

On January 13, 1988, the day before the scheduled trustee's sale, Wilson's attorney contacted the trustee who was to conduct the sale, requesting a

statutory one-day continuance. That same day Cleland hand-delivered a letter to the trustee memorializing the request. According to Cleland's testimony, the trustee said if Halprin filed chapter 7 bankruptcy, as she had been advised by Wilson's attorney was Halprin's intent, then no sale would proceed for two to three years. Cleland's attorney testified they relied on the trustee's statement, and therefore ended their inquiry into the pending sale.

Cleland's testimony was corroborated by Halprin's bankruptcy attorney (Hagen), who also spoke to the trustee. Hagen further admitted the purpose of Halprin's subsequent chapter 7 filing was to stop the pending foreclosure sale. The sale was postponed until February 23, 1988. Orendain personally sent notice of the new sale date to Wilson and Cleland.

The sale commenced on February 23, 1988. Just prior to the sale, Orendain had Halprin's 28 percent interest reconveyed to the bankruptcy trustee. The sale proceeded on the remaining 72 percent, with S.L. Rey, Inc., emerging as the successful bidder.[2]

Halprin's 28 percent was later sold by the trustee, with Cleland the highest bidder. The bankruptcy court held a hearing to confirm the sale. The court found Cleland had acquired Halprin's 28 percent interest subject only to the Shattuck note. The court also found the February 23, 1988, foreclosure sale did not violate Halprin's automatic stay.

On March 17, 1988, Wilson filed a complaint alleging six causes of action. Orendain challenged Wilson's standing to claim that Halprin's bankruptcy stay had been violated. The trial court entered summary adjudication in favor of Orendain. Wilson filed a petition for writ of mandate, claiming to be a creditor of Halprin. To support the claim, Wilson stated that payments were made on behalf of Halprin that conferred an equitable lien in Wilson's favor.

We relied on Wilson's statement and granted their petition. We ordered the trial court to set aside its summary adjudication in favor of Orendain concluding, "Wilson and Redondo have standing as alleged creditors to bring an action claiming the stay was violated causing damages."

---

[2]S.L. Rey was another newly formed corporation, 100 percent capitalized by Rivas, and with Orendain as president. Interestingly, the Bonsall property abuts the San Luis Rey river in San Diego County.

At trial, after presenting their entire case, Wilson moved for judgment. Orendain moved for judgment under Code of Civil Procedure section 631.8. The trial court granted Orendain's motion, and Wilson timely appealed.[3]

## DISCUSSION

■ Neither party disputes that when a motion under Code of Civil Procedure section 631.8 is granted, the trial court's findings are reviewed under the substantial evidence test. However, Wilson contend their appeal "addresses three critical issues of law which formed the basis of appellants' action against S.L. Rey, and which, if decided correctly, compel a finding in favor of appellants." Based on this assertion we focus our discussion on the "three critical issues of law" which Wilson present:

"1. Orendain as a cotenant with Wilson and Halprin could not notice a foreclosure against his cotenants to force them to pay his share of a common encumbrance.

"2. Orendain violated the bankruptcy stay by holding a foreclosure sale on the property and failing to obtain relief from the stay.

"3. As a matter of real property law, Orendain could not effect a partial reconveyance of a joint and several debt from a blanket encumbrance on the property; therefore he did not evade the automatic stay, the foreclosure sale was voidable and the notice of sale was defective."

Analytically, issue 3 is a subissue of 2 and they will be discussed together. We now turn to the cotenancy question.

## I. COTENANTS

■ Wilson asserts that SYA acquired Pikush's undivided 28 percent interest as a tenant in common with Wilson and Halprin. The trial court found that SYA acquired its 28 percent interest "by foreclosure, that SYA did not become a party, did not take subject to, did not assume that co-tenancy agreement. The co-tenancy agreement was destroyed, at least as to Pikush, and then to Pikush's successor, SYA." From that finding, the trial

---

[3]Although Wilson filed amended notice of appeal from both the judgment and the order awarding attorney fees, no argument is presented regarding the posttrial proceedings.

court concluded that SYA did not take title as a tenant in common, but rather as a joint venturer.[4]

While we find that the trial court's fact findings are supported by the record, the legal conclusion, that SYA did not take title as a tenant in common, is erroneous. In California, the ownership of property by several persons is either: (1) of joint interests; (2) of partnership interests; (3) of interests in common; or (4) of community interest. (Civ. Code, § 682.) If an estate is conveyed or transferred and it is not expressly declared an estate in joint tenancy (requiring concurrence of the four unities, time, title, interest and possession), or an estate in partnership, for partnership purposes (as determined by the intent of the parties), it will be held by the grantees or transferees as tenants in common. (*Estate of Horn* (1951) 102 Cal.App.2d 635 [228 P.2d 99].) California favors tenancy in common, contrary to the common law favor of joint tenancies. (Civ. Code, § 686; *Swartzbaugh* v. *Sampson* (1936) 11 Cal.App.2d 451 [54 P.2d 73].) Tenancy in common merely requires, for creation, equal right of possession or unity of possession. (Civ. Code, § 686; *Wood* v. *Henley, supra,* 88 Cal.App. 441; *Robinson* v. *Bledsoe, supra,* 23 Cal.App. 687.)

Having established that SYA, by taking Pikush's undivided 28 percent interest, became a tenant in common with Wilson and Halprin, we now turn to the incidents of cotenancy. ■ Cotenants stand in fiduciary relationship to each other. (*Aaron* v. *Puccinelli* (1953) 121 Cal.App.2d 675 [264 P.2d 152].) Thus, when a cotenant acquires an adverse outstanding title or encumbrance, he does so as trustee for the benefit of his cotenants. (*Smith* v. *McNutt* (1909) 156 Cal. 769 [106 P. 70].) Cotenants stand in such confidential relation to one another in respect to the common property and the common title that it would be inequitable to permit one, without the consent of the others, to buy an outstanding adverse claim or title and assert it for his exclusive benefit, and to thereby undermine the common title and injure and prejudice the interests of his cotenants. (*Ferry* v. *McNeil* (1963) 214 Cal.App.2d 411 [29 Cal.Rptr. 577].)

■ Were we to end our inquiry here, we would have to conclude that the trial court erred. However, the facts of this case compel analysis of the

---

[4]The trial court in pertinent part stated: "For the reasons I've just indicated, I'm satisfied that he's coming in as a subsequent co-owner. In other words, it's not joint tenants. What is there? Four unities? Interest, time, title and possession? [¶] He's not really a co-tenant; which is like three unities; title, interest and possession; because he's a co-owner. [¶] I don't know. A joint venturer, I think, is what the D.C.A. styled its position. [¶] I find in that capacity . . . ."

The court's statement of what it would take to create a tenancy in common "like three unities" is contrary to well established case law. Only unity of possession is required to create a tenancy in common. (Civ. Code, § 686; *Wood* v. *Henley* (1928) 88 Cal.App. 441 [263 P. 870]; *Robinson* v. *Bledsoe* (1914) 23 Cal.App. 687 [139 P. 245].)

question whether cotenants who acquire their interests at different times, by different instruments, should be held as fiduciaries to one another.[5]

Courts in other jurisdictions have held the reason for the rule (trust) is absent when cotenants acquire their interests at different times by different instruments, therefore, no fiduciary relationship exists. (*Turner* v. *Sawyer* (1893) 150 U.S. 578, 586 [37 L.Ed. 1189, 1191, 14 S.Ct. 192]; *Hodgson* v. *Federal Oil & Development Co.* (1927) 274 U.S. 15, 19 [71 L.Ed. 901, 905, 47 S.Ct. 502, 54 A.L.R. 869]; *Stevens* v. *Reynolds* (1895) 143 Ind. 467 [41 N.E. 931]; *Boynton* v. *Veldman* (1902) 131 Mich. 555 [91 N.W. 1022]; *Brokaw* v. *Richardson* (Tex.Civ.App. 1923) 255 S.W. 685, 687 [dicta]; *Dampier* v. *Polk* (1952) 214 Miss. 65 [58 So.2d 44, 50].) No California court has addressed this exception to the rule.

While this is a question of first impression in California, it is not a difficult one. It would be an elevation of form over substance to hold that a fiduciary relationship exists between strangers merely because they have acquired interest in the same piece of property. In the instance of a joint tenancy, by definition a relationship of trust and confidence exists between the joint tenants. Where tenants in common receive their interests at the same time, such as the same deed[6] or will, again, a fiduciary relationship exists.

But where, as here, cotenants acquire their interests at different times through different instruments, and no relationship of trust and confidence exists between them, then no fiduciary relationship can be found to exist. (*Stevens* v. *Reynolds, supra,* 41 N.E. 931; *Boynton* v. *Veldman, supra,* 91 N.W. 1022; *Brokaw* v. *Richardson, supra,* 255 S.W. at p. 687 [dicta]; *Dampier* v. *Polk, supra,* 58 So.2d at p. 50.) This holding is consistent with an observation made long ago by our Supreme Court in *Smith* v. *McNutt, supra,* 156 Cal. 769, that a fiduciary relationship can have no application, absent the relationship which constitutes the whole reason for its existence.

The trial court here specifically found no relationship of trust and confidence existed between Wilson and Orendain, Wilson treated Orendain as a stranger, and therefore no fiduciary relationship existed. Substantial evidence supports this finding.

## II. VIOLATION OF THE BANKRUPTCY STAY

 Wilson contests the bankruptcy court's finding Orendain did not violate Halprin's automatic stay, because "[t]here is no order whatsoever in

---

[5]This question bears on the passage from *Ferry* v. *McNeil, supra,* 214 Cal.App.2d 411, in that we would have to determine whether Orendain's acquisition and assertion of the Probst note, to the detriment of the cotenants, were inequitable.

[6]Clearly a fiduciary relationship existed between cotenants Wilson, Halprin and Pikush.

Mr. Halprin's Chapter 7 Bankruptcy file." Wilson accurately recites the bankruptcy court's finding, but refers to it as "a casual remark." We disagree.

The bankruptcy court made a specific finding, based on the parties' allegations and representations, which it deemed "offers of proof." Based on this evidence, the court stated: "I find there was no violation of the stay." Wilson could have appealed this ruling in the appropriate forum, the bankruptcy court, but did not. Wilson may not now bring that appeal to state court.

As to the partial reconveyance, at trial, Wilson's counsel stipulated the partial reconveyance was not void or voidable. That stipulation waives any argument regarding the validity of the partial reconveyance.

### III. UNCLEAN HANDS

■ He who comes into equity must come with clean hands. (*Stein* v. *Simpson* (1951) 37 Cal.2d 79, 83 [230 P.2d 816] [unclean hands precludes assertion of do equity doctrine and rights of subrogation and restitution].) Unclean hands is an affirmative defense in actions seeking equitable relief. (*Fibreboard Paper Products Corp.* v. *East Bay Union of Machinists* (1964) 227 Cal.App.2d 675, 728 [39 Cal.Rptr. 64] [taking the position the unclean hands is not limited to equity but may be asserted in legal action as well].)

The unclean hands rule does not call for denial of relief to a plaintiff guilty of any past improper conduct; it is only misconduct in the particular transaction or connected with the subject matter of the litigation which is a defense. (*W. U. Tel.Co.* v. *Commercial Pac.C. Co.* (1918) 177 Cal. 577, 585 [171 P. 317].) The bar applies only if the inequitable conduct occurred in a transaction directly related to the matter before the court and affects the equitable relationship between the litigants. (*California Satellite Systems, Inc.* v. *Nichols* (1985) 170 Cal.App.3d 56, 70 [216 Cal.Rptr. 180].) ■ As appellant correctly notes, bad acts post-February 23, 1988 (the date of the challenged foreclosure sale) are not probative to the issues before us, and were therefore inadmissible. (Evid. Code, § 352.)

Orendain notes several instances of Wilson's unclean hands. The trial court found Wilson had come into court with sand and gravel on their hands.[7] The trial court's finding that Wilson mined sand and gravel prior to the February 23, 1988, foreclosure sale, is supported by evidence.

Substantial evidence supports the trial court's finding that Wilson came before it with unclean hands. The record reflects a continuing course of

---

[7]Wilson asserts that Orendain should have been collaterally estopped from arguing "waste issues" because they obtained an order preventing consolidation with this case of the waste

refusal to make note payments, to pay taxes, to account for royalties, rents and profits, and misuse of the bankruptcy court to delay and defeat the legitimate claims of lienholders, including Orendain.

## DISPOSITION

The judgment and order are affirmed. Respondents to recover costs on appeal, including reasonable attorney fees to be determined by the superior court.

Todd, Acting P. J., and Froehlich, J., concurred.

A petition for a rehearing was denied July 21, 1993, and appellants' petition for review by the Supreme Court was denied October 21, 1993.

---

cases still pending in superior court. Clearly, the evidence admitted was relevant to Wilson's clean hands, and thus the propriety of granting equitable relief from the foreclosure sale; it was therefore properly received.